2003 WY 106

**Lance W. SPINNER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 01–222.

Supreme Court of Wyoming.

Sept. 5, 2003.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel.

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Rebecca A. Lewis, Special Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶1] In June 2001, a Campbell County jury found Lance Spinner (appellant) guilty of battery against a household member in violation of Wyo. Stat. Ann. § 6–2–501(b) and (f)(ii) (LexisNexis 2003), a felony. The district court sentenced appellant to a fifteen to twenty-four month prison term. On appeal, appellant argues that the district court erred in allowing the State to introduce expert rebuttal testimony that amounted to improper character evidence, that in their trial testimony, officers attributed statements to appellant that were obtained in violation of appellant's *Miranda* rights, that the prosecutor improperly commented on appellant's pre-arrest silence, that the district court erred in allowing witness testimony regarding the alleged victim's hearsay statements pursuant to the excited utterance exception, that the district court erred in failing to bifurcate the proceedings concerning evidence of appellant's prior convictions, and that these claimed errors amounted to cumulative error requiring a reversal of appellant's conviction. We reverse and remand for a new trial.

## ISSUES

[¶2] Appellant phrases the appellate issues as follows:

*ISSUE I*

Whether the trial court erred in allowing the testimony, on rebuttal, of the State's expert witness Michelle Daigle, as said testimony was used by the State as improper character evidence against appellant and it was not true rebuttal evidence?

*ISSUE II*

Whether appellant was timely advised of his *Miranda* rights, and whether statements made by appellant which were used against him, were in violation of his constitutional rights?

*ISSUE III*

Whether the prosecutor impermissibly commented on appellant's pre-arrest silence, solicited impermissible evidence of appellant's pre-arrest silence and argued appellant's guilt based upon appellant's

pre-arrest silence, all in violation of appellant's constitutional rights?

*ISSUE IV*

Whether the district court erred by admitting prejudicial and improper hearsay, determining that such hearsay qualified as an "excited utterance" under W.R.E. 803(2)?

*ISSUE V*

Whether appellant was denied due process when the court failed to bifurcate the domestic violence trial from the penalty phase, thus allowing the jury to hear about Mr. Spinner's two prior domestic violence convictions?

*ISSUE VI*

Because of the numerous errors made during appellant's trial, did cumulative error occur?

The State phrases the issues in substantially the same manner.

## FACTS

[¶ 3] On January 19, 2001, appellant and his girlfriend, Jessica Manke (Manke), shared a residence in Campbell County. That evening, the two went to a party at Sean Eckenrod's (Eckenrod) residence. Upon arriving at the party, appellant and Manke began arguing and raised mutual allegations of unfaithfulness. Manke returned home and appellant remained at the party. Around 4:00 a.m. on January 20th, Eckenrod and appellant returned to appellant's residence, where appellant and Manke resumed arguing.

[¶ 4] We will very generally refer to the witness testimony as to what occurred thereafter. Eckenrod testified that during the argument, Manke twice initiated physical contact with appellant and also asked Eckenrod to "knock" appellant "out." According to Eckenrod, appellant ultimately turned and walked away from Manke, and Manke locked herself in the bathroom. Eckenrod and appellant continued to converse, and Eckenrod left the residence by 5:30 a.m.

[¶ 5] Appellant chose to testify at trial. He testified that during the argument, Manke twice initiated physical contact with him and he "threw her off," he and Manke disturbed items in their bedroom as each wanted the other to leave the residence with their respective belongings, and Manke then "ran into the bathroom and locked the door." According to appellant, Manke stated that she would not leave the residence and threatened suicide. At some point, appellant heard glass "shattering" and unlocked the bathroom door with a kitchen knife. He discovered the bathroom in disarray and Manke holding glass in her hands. Appellant removed the glass from Manke's hands, which appeared to be cut and scraped, and attempted to calm Manke. According to appellant, Manke then left the residence in her car.

[¶ 6] Manke did not testify in person at trial. Instead, appellant's counsel played her taped preliminary hearing testimony to the jury. In that testimony, Manke stated that she initiated physical contact with appellant during the argument, he "pushed" her away but did not otherwise initiate physical contact with her, and she locked herself in the bathroom. According to Manke, she "popped a handful of sleeping pills" because she did not want appellant to leave and "punched out a picture frame." Appellant entered the bathroom and held her only "to keep me from hurting myself," and Manke left the residence for the Knigge residence because she wanted "sympathy." At the Knigge residence, Manke told the police that appellant choked her, kicked her, and pulled her hair, but claimed at the preliminary hearing that she lied to the officer out of "[a]nger, frustration, and I was wanting to get Lance back," "it was revenge."

[¶ 7] Lyle "Buzz" Knigge, and his girlfriend Mary Knigge, lived three trailers from appellant and Manke. At approximately 7:00 a.m. on January 20th, while Buzz and Mary Knigge were sleeping, Manke entered the Knigge residence, "crying and screaming," through an unlocked patio door. Buzz Knigge, awakened from a deep sleep, asked "What the hell is going on?," to which a "pretty upset" Manke replied "Lance just beat the shit out of me." According to Mary Knigge, Manke came "running in" and appeared "scared," and told Mary Knigge that she and appellant "got in a fight" and appellant was "choking her." Mary Knigge observed redness on Manke's neck, and an

injury to her hand. Mr. Knigge called the police.

[¶ 8] Officers Rebecca West and Chuck Deaton arrived at the Knigge residence shortly thereafter. As the officers arrived, they encountered appellant as he proceeded towards the Knigge residence. After some interaction, Officer West went inside the Knigge residence, while Officer Deaton remained outside with appellant. Upon entering the residence, Officer West recalled that Manke was "real stiff" and "lethargic," "[a]lmost in shock," her voice was "scratchy and she kept having to clear her throat." According to the officer, Manke's right hand was covered in blood, a couple of the knuckles swollen and bruised, her throat area was red, and she complained of a bruise on her arm and a knot on the left side of her forehead.

[¶ 9] Officer West exited the residence, informed appellant that he was under arrest, and a struggle between appellant and the officers ensued. At some point during the struggle, Officer West recalled appellant screaming "she's cheating on me, what was I supposed to do." The officers subdued appellant and Officer Jason Marcus transported appellant to the detention center. According to Officer Marcus, appellant again stated "What was I supposed to do? She was cheating on me" during the transport. Appellant also apparently stated that he had not done anything to warrant his arrest.

[¶ 10] Manke informed an EMT who responded to the Knigge residence that she "had been hit with a fist to her head and shoulders, and that she had been choked." She also complained of neck, left clavicle, and right wrist pain, and tenderness in her lower back. A nurse noted that Manke reported "right hand pain through glass frame. Neck and back. Fell into tub. Choked. Hit head."

[¶ 11] Officer West went to appellant's residence and described the scene as follows:

As we go into the back in the main master bedroom, the place is destroyed. There's blankets everywhere and the curtains were ripped off the windows. The clothes are ripped thrown everywhere. It's a complete mess. The window above the bed

has been shattered. There's glass on the floor.

So we go in the bathroom and there's a picture frame that's wooden in the garbage can and also glass on the floor as well as in the garbage can. There's a broken towel rack. There's clothes and stuff strung all over the place in the bathroom.

Two days later, Manke's mother observed bruising on Manke's neck that "looked like from fingers." However, when Officer West contacted Manke to take pictures of bruising, Manke replied that there was no bruising.

[¶ 12] Appellant was charged with battery on a household member in violation of Wyo. Stat. Ann. § 6-2-501(b) and (f)(ii), a felony. In June 2001, a jury found him guilty of that offense, and the district court sentenced appellant to a fifteen to twenty-four month prison term. Appellant appeals from that judgment and sentence.

## DISCUSSION

### *Constitutional Right to Silence*

[¶ 13] Appellant argues that the prosecutor improperly commented on appellant's pre-arrest silence during opening statement, in questioning law enforcement officers during the prosecution's case-in-chief and rebuttal case, in cross-examining appellant, and during the prosecution's closing and rebuttal argument. Appellant's trial counsel did not object to these alleged comments at trial. On appeal, it is therefore incumbent upon appellant to demonstrate plain error in that "the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Compton v. State,* 931 P.2d 936, 939 (Wyo.1997).

[¶ 14] The record clearly reflects what occurred at trial without resorting to speculation. To accurately establish the context of the challenged statements, we quote extensively from the trial record. The prosecutor made the following remarks during opening statement:

The police ... [p]ulled up and Becky West sees this man, the defendant, approaching [the Knigge residence] quickly.

She intercepts him at the fence. The defendant is just approaching the gateway to Buzz's yard when Becky West approaches him and intercepts him.

And she says, "Who are you, because we just got called to this disturbance."

She just wants to know his name. Who are you? The defendant refuses to give her his name. She says, "Where do you live?"

The defendant refuses to even say where he lives.

He's asked several times by officers who he is, and never once for the simple request just to know who he is does he give them any information at all.

He's just trying to dodge around moving back and forth and trying to get closer and closer and closer to the inside of Buzz Knigge's house where Jessica had ran to.

In fact, at one point the officers are out there and he says he wants to go check on his car trying to go around. There's a back entrance to Buzz Knigge's house, ladies and gentlemen, back here. The defendant tries to go around that way and they intercept and say, no, you need to stay right here until we figure out what's going on.

[¶ 15] The prosecutor then elicited the following testimony from Officer West during the prosecution's case-in-chief:

A. We got a report that the dispatcher said she received a 911 call from [the Knigge address] stating that there was a female there that had run from [appellant's address] because there had been a physical family fight between her and a male.

Q. So when you pulled up to [the Knigge address], did you have any names at that point as to who was involved and in what?

A. No, we did not. The only name we had was that the victim was at Buzz Knigge's house.

Q. Okay. When you pulled up to [the Knigge address], do you see anything right on pulling up?

A. Yeah. As we were pulling up to the house, we noticed that there was a male dressed in jeans and a green long-sleeve

shirt walking towards the trailer. He's almost to the corner of the yard when we pull up in the drive there.

. . .

A. As we're pulling in, he's still on the street and he crosses over and he's just about to the corner of the residence. . . .

. . .

Q. When you see this male approaching [the Knigge address], what do you do?

A. Well, I immediately—I was in the passenger's side. I immediately get out of the patrol car. Officer Deaton gets out shortly after me and we confront the male. He's about to the gate. He hasn't quite made it to the chain link gate. Then at that time I asked him what his name was and if he lived there. And he stated no, and he wouldn't tell me what his name was.

Q. Let me slow you down here. . . .

. . .

Q. Okay. So you asked him what his name was and he wouldn't give that to you?

A. No. He told me he needed to go inside of the trailer and I asked him if he lived there and he told me no.

Q. What trailer is he saying that he needs to go inside of?

A. Into Buzz's trailer there. I knew that to be Buzz Knigge's house from prior contacts.

. . .

Q. Okay. What do you do at that point?

A. After he wouldn't tell me who he was and why he needed to be in the trailer, I told him we received a report from this trailer and we were there investigating a 911 call and needed to know what was going on. That's why it was important that we know who he was.

. . .

Q. You were just investigating at that point?

A. Yeah. We hadn't even touched him at that point. We weren't letting him in the gate. He kept trying to get in the gate but, yeah, I told him I couldn't let him

in the house until we knew what was going on.

Q. What happens at that point?

A. He was real nervous. He was kind of bouncing off the sidewalk back and forth. Wouldn't stand still. Wouldn't answer. Wouldn't tell Chuck [Deaton] who he was. Wouldn't tell me who he was. At one point he tried to walk around me and reach for the latch on the chain link gate and actually flipped the latch up. At that point I grabbed the top of the gate and stood directly in front of him.

. . .

A. I told him he wasn't going to go in until we found out what was going on inside.

Q. What happens at that point?

A. About that time is when he tells me fine, he's just going to go home. He won't tell us where home is. And Officer Marcus shows up about that time.

. . .

Q. Is this male in the green shirt—let me—just to clear things up, were you able to get the name at some point of who the male in the green shirt was?

A. Yeah, I—after I made an initial appearance on the deck and I just—I hadn't even crossed over the threshold of the trailer, I asked Buzz. And the female later identified him that this was the guy. And Buzz said, "Yeah, that's Lance." And I confirmed with Jessica that that was Lance. And then I stepped out and asked him if that was his name and he said it was.

Q. Okay. How many times before you actually found out from other people who he was? How many times had he refused to give you that information?

A. I asked him three maybe four times, and I think that Officer Deaton asked him once or twice.

Q. And until these people inside the trailer, inside Buzz's house, until they gave you his name, was the defendant ever cooperative in giving you his name?

A. No, that was as much cooperation as he ever gave.

Q. Let me ask you about his mood. You said that he was kind of bouncing around.

A. Yeah. He was real—wouldn't stand still. He wouldn't talk to us. Real—just, yeah, just bouncing off the wall. He was real hyped up.

. . .

Q. Okay. During this time when you were approaching with Lance Spinner, did you ever—did he ever say anything to you, to you two officers?

A. While I'm—at what point?

Q. Well, did he ever respond to any questions of yours?

A. Not to mine, no. He just refused to answer anything I had to say.

Q. Okay. Beyond the questions that you've already testified about that you asked him, his name and where he lived, did you ask him any other questions?

A. I had asked him if his wife or girlfriend was inside the trailer and if they had had a fight. And he responded no to both of those questions.

Q. Did you, beyond asking him about that, did you ask him any other questions?

A. I just asked him what he was doing down there and he wouldn't tell us.

The prosecutor queried Officer Jason Marcus in a similar manner:

Q. Can you tell us—when you first saw this person you described as Lance Spinner, can you tell us what is his mood?

A. He was very excited at that point. I speak to Officer Deaton and he wants me to stay with the male, and he at that time wanted to get inside the fence area.

Q. Who wanted to get inside the fence area?

A. Lance Spinner.

Q. How do you know that?

A. He said he wanted to go in and see if his girlfriend was there.

Q. And you said he was very excited. Can you describe what was it about him that made you think he was excited?

A. He was walking back and forth and attempted to get inside the fenced area. I told him that he needed to stay here and

talk to me, and I tried to get his name at that point. And he again tried to go inside the fenced area. I put my hand on his arm to stop him from going inside the fenced area just to see, you know, his name and other just general information I needed at that point.

Q. When you asked him the first time for his name, what did he tell you?

A. He didn't say anything. He was very in tuned about just the front of the residence. He was staring at the front door of the residence.

. . .

A. Yes. I put my hand on him to hold him—to stop from going inside the fenced area.

Q. What happened at that point?

A. At that time he again starts to pace and starts to go around the back of the residence saying he wants to see if his car is there.

Q. Does he actually head off in some direction?

A. Yes. He goes toward the back of the residence along the side.

. . .

A. At that time, again, you know, we got about to here. I told him we needed to come back because I wanted to make sure the other officers were okay at that point. And I told him just to stay over here by the front area of the home. And asked him again what his name was.

Q. Okay. When you get him around to the back—to the front or the first gate where you saw him at and you asked him his name, what—did he give you his name?

A. No, he doesn't. Again, he says that he just wants to see if she's in there. And Officer Deaton then comes out to assist me at that point.

. . .

Q. At any time before Officer West comes back outside, does he give you any of the information that you requested?

A. No.

[¶ 16] The prosecutor questioned Officer Jay Ostrem as follows regarding a phone conversation with appellant:

A. I told him that I was Sergeant Ostrem with the police department; that I was returning his call, and I asked how I could help him.

Q. What did he say?

A. He wanted to know why officers had been in his house and who these officers were.

Q. And what did you say?

A. I told him that the officers were probably in his house because it was a crime scene.

Q. Did he respond?

A. He stated that he had been arrested at Buzz Knigge's, which would be down in the area of [the Knigge address] and [appellant] was living at [appellant's address].

Q. And what did you say in the next step of the conversation?

A. Well, I asked him, "Where did you assault the girl?"

Q. Was that exact language?

A. Yes.

Q. What did he say?

. . .

A. He said, "In my house."

Q. Was that it?

A. Well, I told him, "Well, then it's a crime scene."

Q. When you tell him that it's a crime scene, does he have any further explanation?

A. Well, he seems fine with that. And then asked who the officers were that were in the house.

. . .

Q. Sergeant Ostrem, did Mr. Spinner ever say anything exactly about the fight itself?

A. No, he didn't.

Q. Okay. Did he ever question why it was a crime scene beyond what you told him?

A. No.

[¶ 17] The prosecutor made the following remarks during closing and rebuttal argument:

What we do know with certainty is that [Manke] ran out of the house. She was

upset. She was crying. She ran up to Buzz Knigge's house....

. . .

The defendant not far behind because just as the police get there, the defendant is approaching Buzz's residence.... He's moving straight across from [appellant's address] to [the Knigge address] and he wants to get in.

The police arrive. They don't even know who is involved in it, yet, they don't know anything so they approach the defendant and they say, "Hey, what's your name?" He won't even give them that information. They said, "Where do you live?" He won't give them that information either.

He's agitated. He's moving back and forth. He's trying to get closer and closer to [the Knigge address]. And why, ladies and gentlemen? Because he wants to get to the victim before the police do. That's what makes sense from that pattern.

And why does he want to get to the victim before the police do?

Because he just attacked her. He just caused the injury to her and he doesn't want to get in trouble again.

. . .

The defendant keeps trying to get around the officers. In fact, he starts outside the gate, ladies and gentlemen, trying to get around them. And as the officers are talking with him trying to get information from him, he repeatedly refuses to give any information. He then tries to go around to the other side. And around here, ladies and gentlemen, to the other door to get at [Manke].

The officers stop him. Jason Marcus says, "No, you've got to stay over here." And by that time the defendant manages to sneak around and get inside Buzz Knigge's gate before the officers are able to slow him down and stop him from moving any further. They even have to warn him, you know, if you don't stop that, you may be charged with interference. He's that uncooperative. He's that excited. He's that eager to get in with Jessica Manke and prevent her from hurting him. Prevent her from calling the law on him and getting him the just reward that he deserves for what he just did to her.

. . .

While speaking with Sergeant Ostrem, Sergeant Ostrem returns his phone call. The defendant—he wants to know why officers were in his house, and Sergeant Ostrem returns the phone call and says, "Well, it's a crime scene."

Defendant says, "I was arrested in front of Buzz Knigge's house."

Sergeant Ostrem says, "Where did you assault the girl?"

Defendant says, ["]What?"

"Where did you assault your wife or girlfriend?"

Defendant says, "In my home."

And that is why it's a crime scene....

. . .

[Appellant's trial counsel] says that Sergeant Ostrem was trying to trip [appellant] up. What story makes more sense to you?

Okay, ladies and gentlemen, we had Sergeant Ostrem testify that there was nothing more to the conversation. No explanation of innocence by the defendant. That he wasn't injecting other things about protesting that Sergeant Ostrem had used the word "assault" with him. But, ladies and gentlemen, when [appellant's trial counsel] says what story makes more sense to you, that's when you are to draw credibility you have to think about who is more credible of a witness?

[¶ 18] Wyo. Const. art. 1, § 11 provides that no "person shall be compelled to testify against himself in any criminal case...." In *Tortolito v. State*, 901 P.2d 387, 390–91 (Wyo. 1995) (footnote omitted), we clearly and unequivocally held that pursuant to this constitutional provision, an individual's

constitutional right to silence exists at all times—before arrest, at arrest, and after arrest; before a *Miranda* warning and after it. The right is self-executing.

Under the erroneous view that no constitutional right to pre-arrest silence exists, a citizen who stands mute in the face of accusatory interrogation about the crime during a law enforcement investigation and

inquiry is without constitutional protection against law enforcement personnel who treat silence as probative evidence of guilt. Law enforcement personnel can time the citizen's arrest to occur after the citizen stands mute in the face of the accusation. This practice, which encourages manipulative timing of arrests, does not serve the constitutional provision's purpose of protecting the right to silence during pre-arrest, accusatory interrogation by the state's agents. Permitting prosecutorial use of that silence discourages a law enforcement system's reliance upon extrinsic evidence independently secured through skillful investigation and, instead, encourages reliance upon compulsory self-disclosure. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 1764 12 L.Ed.2d 977 (1964).

Since the right to remain silent is a self-executing right, an accused is presumed to be exercising the right by his silence, pre-arrest and pre-*Miranda* when questioned by the state's agents for purposes of a criminal investigation. Accordingly, the prosecutorial use of the citizen's silence to infer the guilt of the citizen is constitutionally prohibited.

Prosecutorial violations are subject to the *Clenin [v. State,* 573 P.2d 844 (Wyo. 1978)] rule's mandate that failure to respect the constitutional right of the citizen-accused not to have his silence called to the jury's attention will entitle the accused to a reversal of conviction. *Westmark v. State,* 693 P.2d 220, 221–22 (Wyo.1984), *citing Clenin.* A reference to silence which is not a "comment" will not be reversed absent a showing of prejudice. *Parkhurst v. State,* 628 P.2d 1369, 1382 (Wyo.1981).

. . .

A comment upon an accused's silence occurs when used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt.

[¶ 19] In analyzing right-to-silence cases, we consider "the entire context in which the statements were made" and we will "not take sentences and phrases out of context." *Robinson v. State,* 11 P.3d 361, 373 (Wyo.2000), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001). We also evaluate

> whether the prosecutor asked improper questions, whether he emphasized or followed up on the silence issue, and whether he attempted to exploit the issue in any way.

*Lancaster v. State,* 2002 WY 45, ¶ 39, 43 P.3d 80, 96 (Wyo.2002).

[¶ 20] We conclude that the totality of the prosecutor's remarks, particularly during opening statement, and the prosecutor's repeated, specific questions and resulting witness testimony during the prosecution's case-in-chief, amounted to a "comment" on appellant's pre-arrest silence, and necessarily affected appellant's substantial right to "not have his silence called to the jury's attention."[1] The prosecutor began the trial with remarks that exploited anticipated evidence regarding appellant's pre-arrest silence in the face of questions by police officers, and the characterizations contained in those remarks created a clear inference before the jury that appellant's silence and lack of verbal cooperation were consistent with his guilt.[2] The prosecutor stated that when Officer West arrived and intercepted appellant as he quickly approached the Knigge residence, she just wanted to know appellant's name, and appellant "refuse[d]" to provide it to her; that the officer then asked appellant where he lived (which, at trial, the prosecutor knew to be the alleged crime scene) and appellant "refuse[d] to even say where he lives;" and finally that appellant was "asked several times by officers who he is, and never once for the simple request just to know who he is does he give them any information at all."

---

1. "Any comment upon an accused's invocation of his constitutional right to remain silent is prejudicial error per se entitling the accused to an automatic reversal of the conviction." *Beartusk v. State,* 6 P.3d 138, 144 (Wyo.2000). *See also Sturgis v. State,* 932 P.2d 199, 205 (Wyo.1997).

2. The State does not argue that the prosecutor intended to, or did, limit the consideration of this evidence for a particular purpose (i.e., impeachment), and what occurred during opening statement and the prosecution's case-in-chief would substantially undermine such an argument.

[¶ 21] Having established this context and its accompanying inference in opening statement, the prosecutor proceeded to elicit testimony from several police officers regarding appellant's pre-arrest silence. Officer West first testified in response to a general question that appellant would not tell her his name. However, the prosecutor revisited that testimony, repeatedly asked specific questions in that respect, and ultimately elicited a string of similar responses from the witness.[3] At one point in questioning Officer West, the prosecutor even emphasized the extent of appellant's refusal to answer the officers' inquiries:

Q. Okay. How many times before you actually found out from other people who he was? How many times had he refused to give you that information?

A. I asked him three maybe four times, and I think that Officer Deaton asked him once or twice.

Q. And until these people inside the trailer, inside Buzz's house, until they gave you his name, was the defendant ever co-operative in giving you his name?

A. No, that was as much cooperation as he ever gave.

The prosecutor then asked similar, quite specific questions of Officer Marcus and, to some degree, Officer Ostrem.[4]

[¶ 22] During closing and rebuttal argument, the prosecutor reiterated that "as the officers are talking with [appellant] trying to get information from him," appellant would not "even" provide his name or address to the officers and "repeatedly refuse[d]" to give them "any information." While these statements were somewhat more focused in conjunction with the prosecutor's argument that appellant was attempting to "get to the victim before the police" because "he just attacked her," to "prevent her from hurting him," and to prevent "her from calling the law on him and getting him the just reward that he deserves for what he just did to her,"[5] evidence of appellant's silence was not meaningfully probative of that argument as opposed to the aforementioned inference; indeed, the *substantive* use of "silence" is generally of minimal probative value. *See, e.g., Combs v. Coyle,* 205 F.3d 269, 285 (6th Cir.), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000).[6] Further, the officers testified extensively to other evidence regarding appellant's alleged demeanor, alleged conduct, and alleged purpose at the Knigge residence (Officer Marcus testified that appellant said that he wanted to "go in and see if his girlfriend was there") that formed a basis much more probative of the prosecutor's argument. Lastly, in asserting that appellant's version of his conversation with Officer Ostrem was less credible than Officer Ostrem's version, the prosecutor stated that in talking with Officer Ostrem, there was "no explanation of innocence" by appellant.[7]

[¶ 23] The State contends that the instant case is indistinguishable from *Lancaster* in that appellant's silence regarding his name and address was "largely in response to questions that were not about the crime being investigated." In *Lancaster,* 2002 WY 45, ¶¶ 37 and 40, 43 P.3d at 96 and 97, an officer testified that upon encountering Lancaster "walking along a dirt road in a rural area at about 6:00 a.m." and, knowing that

---

3. Some of these responses were to general questions, but given the prosecutor's remarks during opening statement (Officer West having been present in the courtroom as the State's investigating officer) and the prosecutor's repeated, specific questions regarding appellant's silence, it would be quite difficult to find that these responses were unanticipated. The State presents no argument to the contrary.

4. We do not mean to insinuate that the officers acted inappropriately in questioning appellant upon arriving at the Knigge residence. It is the use, and characterization, at trial of evidence regarding appellant's silence in the face of that questioning that is at issue in this appeal.

5. Appellant does not question the propriety of this argument.

6. The context of the prosecutor's argument appears to enhance, rather than diminish, the inference created by the prosecutor's specific remarks on, and characterizations of, appellant's silence.

7. The State devotes considerable argument to this particular statement. However, even in the context of the prosecutor's argument, this statement again appears to reinforce the totality of the remarks, questions, and testimony that occurred previously during the trial.

police in nearby Casper were attempting to locate a murder suspect, the officer asked Lancaster if he was "okay" and whether everything was "all right." According to the officer, Lancaster "ignored me or at least I felt he ignored me," "didn't respond to me at all," and the officer "felt that was suspicious." *Id.*, 2002 WY 45, ¶ 37, 43 P.3d at 96. We concluded that *Lancaster*

> was not a case where, faced with the accusations of investigating officers, the appellant made no response, only to have his silence used against him at trial as evidence of guilt. Instead, the fact that the appellant initially ignored the officer and failed to respond to him was presented in direct testimony simply as part of the circumstances under which the officer first encountered the appellant. It is significant that the questions and answers had nothing to do with the crime itself. It is also significant that, unlike in *Tortolito*, the prosecutor did not mention in opening or argue in closing that the appellant's silence somehow proved guilt.

*Id.*

[¶ 24] The circumstances of the instant case are distinguishable from those in *Lancaster*. In the instant case, Officers West, Deaton, and Marcus responded to a scene that included the alleged victim and the alleged suspect. At different times in the course of investigating that scene, the officers asked appellant to identify himself and his residence (at trial, the prosecutor, witnesses, and ultimately the jury were aware that appellant was the alleged suspect and that his residence was the alleged crime scene). The prosecutor's repeated use and characterization of that evidence throughout the trial transformed the instant case into much more than the brief testimony from one witness presented "simply as part of the circumstances under which the officer[s] first encountered" appellant. *Lancaster*, 2002 WY 45, ¶ 37, 43 P.3d at 96.

[¶ 25] Appellant also challenges portions of the prosecutor's cross-examination of appellant and a question posed to Officer West

during the prosecution's rebuttal case. While one might conceivably argue that such questioning was appropriate for limited impeachment purposes once appellant chose to testify, neither party specifically addresses that issue on appeal. Nevertheless, considering the facts of the instant appeal, we are concerned that to validate the prosecutor's remarks during opening statement and the questions posed, and the substantive testimony elicited, thereafter during the State's case-in-chief could place "substantial pressure" on a defendant "to waive the privilege against self-incrimination . . . at trial in order to explain the prior silence" and undermine one of the fundamental values surrounding the privilege. *Combs*, 205 F.3d at 285.

### Other Issues

[¶ 26] Appellant asserts that the district court's failure to bifurcate the trial, and separately to consider evidence of his two prior convictions for battery against a household member, violated appellant's right to procedural due process.[8] Appellant's trial counsel did not request a bifurcated trial. Instead, appellant's trial counsel and the prosecutor stipulated to the jury at the end of the prosecution's case-in-chief that appellant had two prior battery convictions "against his former girlfriend," who was a household member, and then stipulated that the slightly-redacted judgment(s) and sentence(s) reflecting these prior convictions be introduced into evidence. We anticipate that, on remand, appellant will raise this issue in the district court.

[¶ 27] We first note that the United States Supreme Court has rejected the argument that due process requires a "two-stage jury trial . . . whenever a State seeks to invoke an habitual-offender statute." *Spencer v. State of Texas*, 385 U.S. 554, 564–65, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). In *Spencer*, 385 U.S. at 559, 385 U.S. 554 the petitioners claimed that "Texas' use of prior convictions in the current criminal trial of each petitioner was so egregiously unfair upon the issue of guilt or innocence as to offend the

---

8. In advancing this argument, appellant does not cite or refer to the Wyoming Constitution. Interestingly, the State's response to appellant's argument fails to address the procedural due process issue at all.

provisions of the Fourteenth Amendment...." The United States Supreme Court found as follows:

> To say the United States Constitution is infringed simply because this type of evidence may be prejudicial and limiting instructions inadequate to vitiate prejudicial effects, would make inroads into this entire complex code of state criminal evidentiary law, and would threaten other large areas of trial jurisprudence....
>
> . . .
>
> ... Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure. With recidivism the major problem that it is, substantial changes in trial procedure in countless local courts around the country would be required were this Court to sustain the contentions made by these petitioners. This we are unwilling to do. To take such a step would be quite beyond the pale of this Court's proper function in our federal system. It would be a wholly unjustifiable encroachment by this Court upon the constitutional power of States to promulgate their own rules of evidence to try their own state-created crimes in their own state courts, so long as their rules are not prohibited by any provision of the United States Constitution, which these rules are not.

[10] *Id.* at 562–69, 87 S.Ct. 648 (footnote omitted). Indeed, the

> question of whether a determination by the court or a jury of a second or previous conviction or at what stage for purposes of enhancing punishment raises no constitutional question. It raises only a question of procedure. In *Spencer v. State of Texas,* ... the court recognized that whether the question is presented to the jury or the court, even though there is a potential for prejudice when presented to a jury, it deals with a rule of evidence, not a question of constitutional due process.

*Munoz v. Maschner,* 590 P.2d 1352, 1357–58 (Wyo.1979).

[¶ 28] Aside from appellant's argument that the district court's failure to bifur-

cate the proceedings violated his right to procedural due process, appellant makes no substantive argument regarding precisely what procedure should be utilized. As a result, neither party has adequately briefed the issue and we will therefore only provide the following general guidance. First, Wyo. Stat. Ann. § 6–2–501(b) and (f)(ii) provide as follows:

> (b) A person is guilty of battery if he unlawfully touches another in a rude, insolent or angry manner or intentionally, knowingly or recklessly causes bodily injury to another.
>
> . . .
>
> (f) A household member as defined by W.S. 35–21–102 who commits a second or subsequent battery against any other household member shall be punished as follows:
>
> . . .
>
> (ii) A person convicted upon a plea of guilty or no contest or found guilty of a third or subsequent offense under this subsection against any other household member, after having been convicted upon a plea of guilty or no contest or found guilty of a violation of W.S. 6–2–501(a), (b), (e) or (f), 6–2–502, 6–2–503, 6–2–504 or other substantially similar law of this or any other state, tribe or territory against any other household member within the previous ten (10) years is guilty of a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both.

We have determined that Wyo. Stat. Ann. § 6–2–501(f) does not "create a new offense," but is "merely a sentence enhancement provision rather than being a new independent 'battery against a household member' offense" and enhances "the punishment for individuals who commit simple assault or battery two or more times against household members." *Fall v. State,* 963 P.2d 981, 984 (Wyo.1998). It applies

> when the accused is presently accused of battering a household member and has

previously been convicted one or more times of battering a household member. *Id.*

[¶ 29] Second, according to the United States Supreme Court,

[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *See also United States v. Sullivan,* 255 F.3d 1256, 1264–65 (10th Cir.2001), *cert. denied,* 534 U.S. 1166, 122 S.Ct. 1182, 152 L.Ed.2d 124 (2002) and *Joyner v. State,* 2002 WY 174, ¶ 19 n. 5, 58 P.3d 331, 337–38 n. 5 (Wyo.2002). In *Jaramillo v. City of Green River,* 719 P.2d 655, 659 (Wyo.1986), a case involving a city ordinance that enhanced the penalty for driving while under the influence based on prior convictions, we held:

The rule in Wyoming is that unless a statutory right exists to have the question of prior convictions submitted to the jury, such as that encompassed in the Wyoming habitual criminal statutes, §§ 6–10–201 through 6–10–203, W.S.1977, the court rather than the jury can determine the question of prior convictions. Jaramillo contends, however, that there is language in *State ex rel. Motor Vehicle Division v. Holtz,* Wyo., 674 P.2d 732 (1983) which subjects the submission of prior convictions for driving while under the influence of intoxicating liquor to the same requirements as the habitual criminal statute. The language upon which Jaramillo relies is:

"... [T]he statutory requirement that the sentence to be imposed by the court be more severe as the number of prior convictions of the defendant increases makes the [D.W.U.I.] statute a habitual criminal act. Before the sentence of a defendant can be enhanced under such act, he must have notice of the fact that such is contemplated. Generally, the

notice must be contained in the information or charge under which he is prosecuted. *Evans v. State,* Wyo., 655 P.2d 1214 (1982). Section 6–10–203(a), W.S. 1977 (1983 Replacement), provides:

'(a) An information or indictment which charges a person as an habitual criminal shall set forth the charged felony and allege the previous convictions.'

"Although here we are not concerned with felonies, the reason upon which this section is predicated is pertinent to the requirement of similar notice in DWUI cases." *State ex rel. Motor Vehicle Division v. Holtz, supra,* at 738.

Jaramillo is mistaken in his contention that this language brings this question within the statutory requirement that the issue be submitted to a jury. *In State ex rel. Motor Vehicle Division v. Holtz, supra,* the court simply recognized that due process requires notice if a former conviction is to be used to enhance punishment. Certainly the Wyoming habitual criminal statutes do not by their terms encompass misdemeanor convictions for driving while under the influence of intoxicating liquor. There is no indication in *Holtz* that the court could or would expand those statutes to encompass these misdemeanor offenses. The ordinance of the City of Green River does not require a determination by the jury of the issue of prior convictions. We hold that with respect to such sentence enhancement proceedings under the state statute or a similar city ordinance, unless the statutory language so requires, a right to a jury trial with respect to the existence of prior convictions does not exist.

Unlike the habitual criminal statutes, Wyo. Stat. Ann. § 6–2–501(f)(ii) does not expressly provide for a jury determination with respect to the existence of prior convictions.[9]

[¶ 30] Appellant also raises three issues concerning the evidence admitted at trial. Appellant first argues that the testimony of an expert witness during the prosecution's

---

9. Any issue concerning whether appellant is entitled to a jury determination of any other fact that enhances the penalty pursuant to Wyo. Stat. Ann. § 6–2–501(f)(ii) (i.e., whether the underlying of-

fense that is to be tried to the jury was committed against a household member) is not presently before us.

rebuttal case constituted improper character evidence. The witness, a licensed professional counselor, testified to her observations regarding "the patterns of behavior in abusive domestic relationships" and the resulting "cycle of violence." The prosecutor utilized that testimony during his rebuttal closing argument. Shortly after the jury trial of the instant case, we issued an opinion in *Skinner v. State*, 2001 WY 102, 33 P.3d 758 (Wyo. 2001), *cert. denied*, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002). On remand, the prosecutor, in offering and arguing inferences based on such testimony, and the district court, in evaluating the admissibility of the proposed testimony, should carefully apply the principles we established in *Skinner*.

[¶ 31] Appellant next argues that "three (3) alleged admissions" [10] officers attributed to appellant at trial were obtained in violation of appellant's *Miranda* rights. According to appellant, the statements were improperly admitted at trial because appellant allegedly made the statements after he was arrested for the instant offense and the record is silent as to whether anyone ever informed appellant of his *Miranda* rights; therefore, the statements appellant allegedly "made to any police officers or other authorities after he was in custody, should not have been admitted in evidence at trial." Appellant's trial counsel did not file a motion to suppress the three alleged statements nor did he otherwise object to their admission at trial. Because the issue was not raised before the district court, we would have been constrained to the trial testimony in reviewing this issue. Testimony at a suppression, or some other, hearing focused on the merits of this issue likely would specifically reveal whether, and if so, at what point in time, the

officers informed appellant of his *Miranda* rights. Without commenting on the validity of appellant's arguments, we expect that appellant's trial counsel will duly assess the merits of filing a motion to suppress the alleged statements.

 [¶ 32] Appellant also contends that the district court erred in admitting Buzz and Mary Knigge's testimony regarding Manke's statements upon entering their residence as excited utterances. Should this issue arise on remand, we note that one key factual consideration in applying the excited utterance exception is what, precisely, constitutes the "startling event or condition" (based on the record before us, the "startling event or condition" appears to relate back to what allegedly occurred between appellant and Manke at their residence), and that we have previously found a "five-factor" test "useful" in evaluating the admissibility of evidence as an excited utterance. *Oldman v. State*, 998 P.2d 957, 963 (Wyo.2000).

## CONCLUSION

[¶ 33] The prosecutor impermissibly commented on appellant's pre-arrest silence, impermissibly solicited evidence of appellant's pre-arrest silence, and impermissibly argued appellant's guilt based upon appellant's pre-arrest silence. We reverse and remand for a new trial.

---

10. While appellant does not specifically identify two of the three alleged statements, we are able to discern the two unidentified statements from information contained in his appellate brief. First, during the struggle between appellant and the officers at the Knigge residence, Officer West testified that appellant screamed that "she cheated on me or she's cheating on me, what was I supposed to do[?]" Second, while Officer Marcus transported appellant to the detention center in a patrol vehicle, appellant allegedly stated "all of a sudden" and "out of the blue" "What was I supposed to do? She was cheating on me." Finally, Officer Ostrem testified that in response to his question regarding where appellant "assault[ed] the girl," appellant replied "In my house."