2006 WY 153

Georgina Danyel CAZIER, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 05–114.

Supreme Court of Wyoming.

Dec. 15, 2006.

Representing Appellant: Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina N. Kerin, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Georgina Danyel Cazier appeals her conviction for aggravated assault and battery. She asserts that the district court should have granted her motion for a mistrial based upon her claim that a prosecution witness improperly commented on her right to remain silent. Additionally, she claims error in the admission of evidence regarding prior bad acts, character evidence, and vouching for the victim's credibility. Ms. Cazier also challenges the sufficiency of the evidence supporting her conviction and contends that cumulative error warrants reversal. We affirm.

## ISSUES

[¶ 2] We rephrase the issues presented by Ms. Cazier as follows:

I. Did the district court abuse its discretion in denying appellant's motion for mistrial after the investigating officer testified that Ms. Cazier had refused to speak to him?

II. Did the district court erroneously permit evidence or argument concerning prior bad acts of Ms. Cazier?

* Chief Justice at time of oral argument.

III. Was improper character evidence admitted, resulting in plain error?

IV. Did improper vouching for the victim occur, resulting in plain error?

V. Does sufficient evidence support Ms. Cazier's conviction?

VI. Does cumulative error warrant reversal?

## FACTS

[¶ 3] On the morning of March 16, 2004, Ms. Cazier and her husband, Chad, were together at their residence in Lincoln County, Wyoming. After their children left for school, the couple began to argue. Ms. Cazier became angry. She punched Mr. Cazier in the face and whipped him repeatedly with television cables.[1]

[¶ 4] Later that day, Kevin Jackson, Chief of the Afton Police Department, received an anonymous phone tip that Mr. Cazier should be contacted. The informant believed that Mr. Cazier "was being beaten by his wife and . . . was in very bad physical condition." The following day, March 17, 2004, Chief Jackson met with Mr. Cazier and accompanied him to the Lincoln County Sheriff's office to meet with Officer Timothy Malik.[2] Officer Malik immediately observed that Mr. Cazier was injured, noting a black eye and cuts on his face and head. Mr. Cazier lifted his shirt, revealing numerous lacerations and bruises on his torso. Mr. Cazier described the events of the previous day and explained that Ms. Cazier had inflicted his injuries. Mr. Cazier also showed Officer Malik a cut on his forearm and explained that his wife came at him with a knife. He believed he had been cut in the course of attempting to defend himself. Additionally, Mr. Cazier related a prior incident of whipping on March 11, 2004.

[¶ 5] Officer Malik accompanied Mr. Cazier to the emergency room at Star Valley Medical Center. During the physical examination, Officer Malik took photos of Mr. Cazier to document his injuries. Mr. Cazier was admitted and remained in the hospital for several days.

[¶ 6] On March 18, 2004, Officer Malik executed a search warrant at the Cazier residence and retrieved the television cables and a note from Ms. Cazier apologizing to her husband for her behavior. Ms. Cazier was charged with aggravated assault and battery, in violation of Wyo. Stat. Ann. § 6-2-502(a)(i) (LexisNexis 2003) for beating her husband with the television cables on March 16, 2004.[3] Ms. Cazier was also charged with two other felony counts—aggravated assault and battery, in violation of Wyo. Stat. Ann. § 6-2-502(a)(i), for the alleged beating on March 11, 2004, and assault with a deadly weapon, in violation of Wyo. Stat. Ann. § 6-2-502(a)(ii) (LexisNexis 2003), for allegedly cutting Mr. Cazier with a knife.

[¶ 7] A jury trial was held. Ms. Cazier denied any fight with her husband on March 11, 2004, and introduced evidence that he was at work at the time. Ms. Cazier did not dispute that she and her husband fought on March 16, 2004, that she had hit him with the cables, or that she had armed herself with a knife. However, she claimed that Mr. Cazier had been the aggressor and described her actions as self defense. She denied that Mr. Cazier had been cut by the knife during their fight. She also claimed that Mr. Cazier caused many of his own injuries by hitting himself. The jury found Ms. Cazier guilty of

---

1. The cables were admitted into evidence, photographs of which were included in the record on appeal. Although there is no testimony describing the cables, they appear to be multi-component audio visual cables several feet in length with colored RCA-type leads on each end.

2. Timothy Malik was a Lieutenant with the Lincoln County Sheriff's office in March, 2004. When he testified, he held the position of Undersheriff.

3. Wyo. Stat. Ann. § 6-2-502 provides, in pertinent part:

(a) A person is guilty of aggravated assault and battery if he:
(i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;
(ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;
. . .
(b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

one count of aggravated assault and battery for beating Mr. Cazier with the cables on March 16, 2004. The jury returned a not guilty verdict on the other two counts.

[¶ 8] Ms. Cazier was sentenced to a term of imprisonment of eighteen months to five years, which was suspended pending completion of a split sentence—one year of incarceration in the Lincoln County Jail and three years of supervised probation. The sentence was stayed pending this appeal. Further facts will be discussed as needed in our review of Ms. Cazier's claims on appeal.

## STANDARD OF REVIEW

[¶ 9] We review the denial of a mistrial motion under an abuse of discretion standard. *Lucero v. State*, 14 P.3d 920, 924 (Wyo.2000). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.*

[¶ 10] Evidentiary rulings are also committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion. *Lopez v. State*, 2004 WY 103, ¶ 21, 98 P.3d 143, 149 (Wyo.2004). When no objection is made at trial to the evidence challenged on appeal, we apply our plain error standard of review. Plain error will not be found unless: (1) the record clearly reflects the alleged error; (2) the party claiming the error demonstrates a violation of a clear and unequivocal rule of law; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice. *Miller v. State*, 2006 WY 17, ¶ 15, 127 P.3d 793, 797–798 (Wyo.2006).

[¶ 11] In reviewing the sufficiency of the evidence, "[w]e assess whether all the evidence presented is adequate to form the basis for an inference of guilt beyond a rea-sonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State." *Lopez v. State*, 2004 WY 28, ¶ 16, 86 P.3d 851, 857 (Wyo. 2004) (quoting *Estrada–Sanchez v. State*, 2003 WY 45, ¶ 6, 66 P.3d 703, 707 (Wyo. 2003)).

## DISCUSSION

### Motion for mistrial (for improper comment on silence)

[¶ 12] Ms. Cazier claims that the district court should have granted her motion for a mistrial after the State's first witness, Officer Malik, testified "I tried to interview [Ms. Cazier] and she didn't want to talk to me." She contends this constituted an improper comment on her exercise of her constitutional right to remain silent.

[¶ 13] We have described the right to remain silent as "one of the most fundamental rights accorded a defendant in our criminal justice system." *Williams v. State*, 2004 WY 117, ¶ 18, 99 P.3d 432, 444 (Wyo.2004). The right to silence provided by Article 1, Section 11 of the Wyoming Constitution is self-executing, existing pre-arrest when an individual is questioned by the state's agents for purposes of a criminal investigation.[4] *Tortolito v. State*, 901 P.2d 387, 390 (Wyo.1995). "Accordingly, the prosecutorial use of the citizen's silence to infer the guilt of the citizen is constitutionally prohibited." *Id.*

In right-to-silence cases, we evaluate " 'the entire context in which the statements were made' and we will 'not take sentences and phrases out of context.' " *Spinner v. State*, 2003 WY 106, ¶ 19, 75 P.3d 1016, 1024 (Wyo.2003) (quoting *Robinson v. State*, 11 P.3d 361, 373 (Wyo. 2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001)). We also consider " 'whether the prosecutor asked improper questions, whether he emphasized or followed up on the silence issue,

---

4. Article 1, Section 11 of the Wyoming Constitution states:

No person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense. If a jury disagree, or if the judgment be arrested after a verdict, or if the judgment be reversed for error in law, the accused shall not be deemed to have been in jeopardy.

and whether he attempted to exploit the issue in any way.'" *Spinner*, 2003 WY 106, ¶ 19, 75 P.3d at 1024 (quoting *Lancaster v. State*, 2002 WY 45, ¶ 39, 43 P.3d 80, 96 (Wyo.2002)).

*Abeyta v. State*, 2003 WY 136, ¶ 12, 78 P.3d 664, 667–668 (Wyo.2003).

[¶ 14] The statement at issue arose during cross examination when defense counsel inquired as to the nature and extent of the investigation. Officer Malik testified as follows:

[Defense Counsel] Now, and you never interviewed [the children] to see—

[Malik] I never interviewed them.

Q.  —to see what they had to say, if this incident even took place on the 11th? Is that what you mean by an objective interview? You just took [Mr. Cazier's] word for it, didn't you?

A.  Say that again?

Q.  You just took [Mr. Cazier's] word for it that it had happened as he said?

A.  **Well, I tried to interview Danyel and she did·n't want to talk to me.**

(Emphasis added.)

[¶ 15] Defense counsel objected. The district court sustained the objection and then held discussions with counsel in chambers. Defense counsel moved for a mistrial, which the district court took under advisement. The district court offered to provide a curative instruction to the jury when the trial resumed, but defense counsel preferred not to draw undue attention to the testimony at that time. After dismissing the jury at the end of the first day of trial, the district court announced its ruling on the motion for a mistrial. The district court provisionally denied the motion, indicating that if the State tried to refer to the statement or include it in argument, that it would reexamine the motion. The prosecution made no reference to Officer Malik's statement during the remainder of the trial.

[¶ 16] "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial." *Allen v. State*, 2002 WY 48, ¶ 75, 43 P.3d 551, 575 (Wyo. 2002) (quoting *Warner v. State*, 897 P.2d 472, 474 (Wyo.1995)). In reviewing the district court's decision for an abuse of discretion, we inquire as to the reasonableness of the choice made by the trial court. *Lucero*, 14 P.3d at 924. We have recognized that the district court is in the best position to assess any prejudicial impact of this type of claimed error. *Allen*, ¶ 75, 43 P.3d at 575.

[¶ 17] Ms. Cazier characterizes Officer Malik's response to the question as a "gratuitous, unsolicited comment to the jury" concerning the exercise of her right to remain silent. "A comment upon an accused's silence occurs when used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *Tortolito*, 901 P.2d at 391. The statement was not elicited by the prosecution. The record, read in context, does not reflect Officer Malik's intent to cast guilt upon Ms. Cazier. He was responding to vigorous cross-examination, and in his efforts to defend his impartiality and investigatory techniques, he mentioned Ms. Cazier's refusal to speak to him.

[¶ 18] The district court responded reasonably to the motion. The district court offered to draft a curative instruction, advising the jury of Ms. Cazier's constitutional right and prohibiting any inference from her pretrial silence. Defense counsel's rejection of this offer was a "tactical decision that this court will not second guess." *Chapman v. State*, 2001 WY 25, ¶ 22, 18 P.3d 1164, 1174 (Wyo.2001). The district court gave thoughtful consideration to Ms. Cazier's request for a mistrial and even upon denying it, left the matter open for further consideration if the State attempted to use that portion of Officer Malik's testimony to its advantage. In concluding that a mistrial was not warranted, the district court relied on *Hughes v. State*, 658 P.2d 1294 (Wyo.1983). In *Hughes*, we held that "a fleeting reference to appellant's silence, not resulting from inquiry by the prosecution nor exploited by the prosecution, is not error." *Id.*, 658 P.2d at 1296. We agree with the district court's assessment. The record does not reveal that the State attempted to use Officer Malik's statement to

its advantage. The State did not ask the jury to consider Ms. Cazier's pretrial silence as evidence of her guilt. Accordingly, we can find no abuse of discretion in the district court's denial of Ms. Cazier's motion for a mistrial.

### Evidentiary rulings

[¶ 19] Ms. Cazier presents three issues relating to the admission of evidence. In each instance, defense counsel did not object to the evidence that was admitted. Often, it was defense counsel's questioning that elicited the testimony which Ms. Cazier complains of on appeal. Rather than assume these aspects of defense counsel's trial presentation were misguided, we are mindful that in some circumstances, a failure to object may not be a failure at all, but a tactical decision. Trial counsel may not want to highlight troublesome testimony or, alternatively, may see an opportunity to use such evidence to its advantage. E.g., Sorensen v. State, 6 P.3d 657, 666 (Wyo.2000) (recognizing that defense counsel may make a tactical decision to avoid highlighting certain testimony); Dudley v. State, 951 P.2d 1176, 1181 (Wyo.1998) (recognizing that it is a "tactical decision to follow the path to impeachment rather than challenging the admission of the evidence"); Beintema v. State, 936 P.2d 1221, 1228 (Wyo.1997) ("Counsel may, as a matter of trial strategy, choose not to request a limiting instruction in order to avoid emphasizing the unfavorable evidence."). We are reluctant to second guess such tactical decisions. "It is difficult to discern the atmosphere of a trial or how the jury perceived the proceedings from the sterile, black and white transcript." Belden v. State, 2003 WY 89, ¶ 24, 73 P.3d 1041, 1081 (Wyo.2003). We are in a much better position to review claimed evidentiary errors when an objection is made at the trial level and counsel and the district court can explore and express how the evidence at issue may be impacting the trial.

[¶ 20] At trial Ms. Cazier did not deny the tumultuous nature of the Cazier's marital relationship and the physical altercation on March 16, 2004. However, the defense claimed that Ms. Cazier acted in self-defense and that her husband was the first aggressor and the cause of the injuries. The defense sought to provide alternate explanations for the State's evidence and challenged the credibility of the State's two key witnesses, Mr. Cazier and Officer Malik. The defense focused upon Mr. Cazier's self-destructive behavior and his motives for fabricating allegations against his wife. Additionally, the defense attempted to show that Officer Malik was biased, had rushed to judgment, and had conducted his investigation accordingly. As a result of this strategy, defense counsel pursued lines of questioning and introduced evidence to develop those theories.

[¶ 21] "Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." Ohler v. United States, 529 U.S. 753, 755, 120 S.Ct. 1851, 1853, 146 L.Ed.2d 826 (2000). We have also explained that defense counsel may "open the door" to evidence that the State would otherwise not have been allowed to introduce:

This Court has recognized that a defendant may open the door to otherwise inadmissible testimony when he inquires about a particular subject, including evidence of prior criminal misconduct. When the defendant initiates a line of questioning, the prosecutor is entitled to make a permissible inquiry without crossing into prosecutorial overkill.

It is usually a basic function of redirect examination to allow a witness to explain his testimony elicited on cross-examination.... The opening of the door concept, however, reaches further and is an extension of that familiar rule. Succinctly stated, the opening the door rule is that a party who in some way permits the trial judge to let down the gates to a field of inquiry that is not competent but relevant cannot complain if his adversary is also allowed to avail himself of the opening within its scope.

White v. State, 2003 WY 163, ¶ 11, 80 P.3d 642, 648 (Wyo.2003) (internal citations and quotation marks omitted). See also United States v. Beverly, 5 F.3d 633, 639 (2d Cir. 1993) (recognizing that once a defendant has

put certain activity in issue by offering innocent explanations for or denying wrong-doing, the government is entitled to rebut by showing that the defendant has lied); *United States v. Garcia,* 936 F.2d 648, 653–654 (2d Cir.1991) (noting that when a defendant offers an innocent explanation, he opens the door to questioning into the truth of his testimony). With these general comments in mind, we address Ms. Cazier's claims of evidentiary error.

### A) Prior bad acts

[¶ 22] Ms. Cazier asserts that the district court erred in admitting evidence of uncharged misconduct, contrary to W.R.E. 404(b). Ms. Cazier challenges testimony that she: (1) hurt her husband on previous occasions; (2) forced Mr. Cazier to make a false police report after one of those previous occasions; and (3) made her daughter falsely report the events of March 16, 2004. It is helpful to examine how the challenged testimony arose, placing the testimony in context, before analyzing Ms. Cazier's claim of error.

[¶ 23] Mr. Cazier testified during the State's case-in-chief. During cross-examination, defense counsel expounded upon its theory that Mr. Cazier's injuries were self-inflicted. Mr. Cazier was questioned about hurting himself:

[Defense Counsel] [The prosecutor] asked you if you did that to yourself, if you ever hurt yourself. You do sometimes, don't you?

[Mr. Cazier] No.

Q. When you get angry?

A. No.

Q. Haven't people seen you do that?

A. No.

Q. Didn't you not too long before that hit yourself—well, hit Danyel and yourself with a broom stick?

A. I was just—I took it from her. I was hitting around with it. I accidentally hit her.

Q. And you hit yourself, also?

A. Yeah, not hard.

Q. Don't you sometimes hit yourself in the face when you get mad?

A. No.

Q. Don't you sometimes thump yourself on the thigh when you get mad?

A. I—I hit my thigh because I—I didn't want to hit her. I wasn't about to hit her.

Q. So you channel your anger elsewhere?

A. Yes.

Q. Okay. Sometimes, you even bang you head on the tile, don't you?

A. No. She'd grab my hair and throw me down on the ground, down on the floor, and end up hitting the tile.

In response to this line of questioning, redirect included the following exchange:

[Prosecutor] Okay. And [defense counsel] talked to you and asked you if you, in the past, had hurt yourself. Had you hurt yourself in the past?

[Mr. Cazier] No.

Q. Okay. Had you told people that you'd hurt yourself in the past?

A. Yes.

Q. And who have you told that to?

A. People I work with.

Q. Okay. Why do you tell them that?

A. I didn't want them to know the truth. I was ashamed of it, embarrassed.

Q. Had you told Deputy Malik earlier this year that you'd hurt yourself?

A. Yes.

Q. Why did you tell Deputy Malik that?

A. Because she would—told me that she wasn't going to jail over—if I died or that.... She was forcing me to do it.

Q. And did you do what you were told to do?

A. Yes.

[¶ 24] Ms. Cazier testified on her own behalf. At the end of her description of the physical altercation that she and Mr. Cazier had on March 16, 2004, she testified:

[Ms. Cazier] ... And he got mad and let out a yell, like an aggravated yell like (indicating) and he was punching his legs.

[Defense counsel] Punching his own legs?

A. Yes.

Q. Where did he punch?

A. In the thigh, the leg, right here.

Q. Just with a fist?

A. With a knuckle.

Q. . . . Is that something he does—

A. All the time.

Q. —when he gets angry or frustrated?

A. When he gets mad and frustrated.

Q. Does he say why?

A. No.

Q. . . . Does he do anything else, I guess I would characterize it as a tension release, when he gets angry?

A. Anything else—

Q. To himself?

A. He's banged his head on the tile floor. He's hit himself in the head with shoes. He's busted things. He's punched his truck bumper, which is metal.

[¶ 25] The defense also presented the testimony of LC, Mr. and Ms. Cazier's thirteen-year old daughter. She was asked about having seen her parents fight:

[Defense counsel] Do they sometimes hit each other?

[LC] Yeah.

Q. Have you seen your dad get real mad?

A. (The Witness nodded.)

Q. What does he do when he gets mad?

A. He either—he sometimes smacks his head against the tile and hits himself with a—with a broom. And he would punch himself in the face and hit himself in the face with a shoe.

The State cross examined LC and elicited the following:

[Prosecutor] Have you seen your mom hit your dad?

[LC] Yeah.

Q. Have you seen your mom hurt your dad?

A. (The Witness nodded.)

. . .

Q. Did you call the Sheriff's Office and tell them that your mom had hit your dad?

A. No.

Q. Okay. Did you call the Sheriff's Office after your dad left home?

A. Yeah.

Q. Okay. What did you tell them?

A. I don't remember exactly what I said. I think it was, like, what my mom did to my dad, my dad done to her, also.

. . .

Q. Do you remember talking to Chief Kevin Jackson of the Afton Police Department some months later?

A. Yeah.

Q. Did you talk to Chief Jackson about that?

A. Yeah.

Q. What did you tell Chief Jackson?

A. I didn't—I didn't talk that much. He did most of the talking.

Q. Okay. Did you tell Chief Jackson that your mom had you make that phone call?

A. (The Witness shook her head.)

Q. Okay. You don't remember that?

A. I know he—he never asked me that.

[¶ 26] In its rebuttal case, the State called Afton Police Chief Kevin Jackson as a witness. He was asked about a conversation he had with LC a few weeks after the incident of March 16, 2004. When asked if LC had spoken to him about making a phone call to the Sheriff's Office after her dad was in the hospital, Chief Jackson testified that LC told him "that she had been told to call the Sheriff's Department and say that [Mr. Cazier] had been beating the mother."

[¶ 27] Also in rebuttal, the State recalled Officer Malik. He described contact he had with the Caziers in January of 2004, when they came in to talk to him:

[Prosecutor] Did you speak to both of them?

[Malik] Yes, I did.

Q. What did they want to speak to you about?

A. They wanted to speak to me about— Danyel was pretty adamant . . . that [Mr. Cazier] tell me that whatever marks were on him at the time were

done by himself, that he had—he had hit himself.

Q. Okay. And did you talk to [Mr. Cazier] about that?

A. Yes.

Q. Did you talk to him alone?

A. Yes.

Q. Did he have a tape recorder?

A. Yes, he did. She was pretty adamant about—that he carry it with him and not turn it off.

Q. Okay. Did he use that tape recorder?

A. Yes.

Defense counsel inquired further on cross examination:

[Defense Counsel] And [Mr. Cazier] told you he'd inflicted those injuries on himself?

[Malik] Yes, he did.

[¶ 28] Ms. Cazier did not object to the testimony at trial. She contends that no objection was needed, citing to *Williams*, ¶ 12, 99 P.3d at 439 and *Howard v. State*, 2002 WY 40, ¶ 23, 42 P.3d 483, 491 (Wyo. 2002) (holding that where a defendant files a pretrial demand for notice of intent to introduce evidence under W.R.E. 404(b), the same shall be treated as the making of a timely objection to the introduction of such evidence). The State concedes that Ms. Cazier filed a pretrial demand but questions whether it was timely because it did not comply with the district court's scheduling order. The record is not clear whether the district court imposed a deadline for defense counsel to demand notice of 404(b) evidence.[5] However, for purposes of this opinion, we will assume that Ms. Cazier's pretrial demand was timely, and pursuant to *Williams* and *Howard*, constituted a timely objection to 404(b) evidence.

[¶ 29] Ms. Cazier claims that contrary to the requirements of *Gleason v. State*, 2002 WY 161, 57 P.3d 332 (Wyo.2002), the State failed to provide notice and identify the permissible purpose of this evidence under W.R.E. 404(b), and the district court failed to evaluate this evidence prior to its admission. We directed in *Gleason* that in cases involving the admissibility of evidence under W.R.E. 404(b), "the record shall reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice." *Id.*, ¶ 30, 57 P.3d at 343.

[¶ 30] W.R.E. 404 provides:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of Witness.—Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have described Rule 404 as governing evidence introduced "only to demonstrate

---

5. Several orders refer to a deadline for motions, requiring them to be filed within twenty days of arraignment. However, at the scheduling conference, the district court indicated that the post-arraignment deadline pertained to jurisdictional matters or motions involving the charges. The district court distinguished evidentiary motions and directed the parties to file such motions prior to the pretrial conference.

that the defendant has a disposition to commit crimes." *Gleason,* ¶ 17, 57 P.3d at 340.

[¶ 31] Although admission of 404(b) evidence in the absence of proper notice of the State's intent to introduce such evidence is error, an appellant cannot demonstrate error by simply branding any evidence 404(b) evidence. Neither defense counsel nor the trial court recognized any 404(b) issue regarding the testimony set forth above. On appeal, the State argues that the lack of objection or trial court attention to the testimony can be easily explained if the testimony did not implicate W.R.E. 404.

[¶ 32] Pursuant to the exception in W.R.E. 404(a)(3), evidence admitted to impeach a witness' credibility falls outside the ambit of the rule. "The credibility of a witness may be attacked by any party, including the party calling him." W.R.E. 607. "A corollary to the rule allowing a party to attack the credibility of a witness is to permit the opposing party to bolster that credibility." *Strickland v. State,* 2004 WY 91, ¶ 22, 94 P.3d 1034, 1046 (Wyo.2004).

[¶ 33] We agree with the State that the evidence challenged by Ms. Cazier was not truly 404(b) evidence. While some of this testimony may have had the collateral effect of painting Ms. Cazier in an unfavorable light, the primary purpose of the testimony involved the impeachment and rehabilitation of the credibility of witnesses. Moreover, when the defendant initiates a line of questioning, the prosecutor is entitled to make a permissible inquiry without crossing into prosecutorial overkill. *Espinoza v. State,* 969 P.2d 542, 546 (Wyo.1998). Specifically, "[a] defendant may 'open the door' on cross-examination to evidence of prior criminal misconduct." *Id.* (quoting *Chavez–Becerra v. State,* 924 P.2d 63, 69 (Wyo.1996)).

[¶ 34] None of the three areas of testimony challenged by Ms. Cazier contravened W.R.E. 404(b). The claimed instances of past violence by Ms. Cazier arose in the rehabilitation of Mr. Cazier, after defense counsel had opened the door by questioning him concerning specific injuries he had incurred in the past. Officer Malik's description of his contact with the Caziers in January of 2004 was permissible because it provided specific contradiction to Ms. Cazier's testimony that she had not forced her husband to tape record his conversation with Officer Malik. Additionally, Chief Jackson's rebuttal testimony was permissible under W.R.E. 613(b) to introduce the prior inconsistent statement of LC because she was first given an opportunity to explain that statement but denied making it.[6]

[¶ 35] Under the circumstances, we do not find impermissible inquiry or "prosecutorial overkill." *Espinoza,* 969 P.2d at 546. The State responded to the defense's theory and the testimony rebutting it was reasonably limited in scope. The State did not suggest that Ms. Cazier had a propensity to commit crime, nor was there any attempt to use evidence regarding Ms. Cazier's prior conduct as substantive evidence of her guilt. Accordingly, we reject Ms. Cazier's claim that the district court was required to evaluate the evidence in accordance with the strictures of our 404(b) jurisprudence. We find no error.

### B) Improper character evidence

[¶ 36] For her next claim of error, Ms. Cazier asserts that Officer Malik offered "quasi-expert" opinion on "domestic violence couples" that constituted improper character evidence. She characterizes the testimony as "profile evidence" and analogizes it to expert testimony on battered woman syndrome, as discussed in *Skinner v. State,* 2001 WY 102, 33 P.3d 758 (Wyo.2001). Ms. Cazier contends that this testimony, combined with the evidence of prior violence between herself and Mr. Cazier, demonstrated efforts by the prosecution to prove that she was a batterer who had acted in conformity with that role on March 16, 2004. No objection was made at trial, and so our review is for

---

6. Upon request, Ms. Cazier would have been entitled to have a jury instruction setting forth the limited purposes of the testimony. *Blumhagen v. State,* 11 P.3d 889, 896 (Wyo.2000). In the absence of such a request, however, we cannot find fault with the district court for not giving a limiting instruction. *Id.*

plain error. *Kenyon v. State,* 2004 WY 100, ¶ 20, 96 P.3d 1016, 1024–1025 (Wyo.2004).

[¶ 37] During the State's rebuttal case, Officer Malik testified as follows:

[Prosecutor]: [T]hroughout your law enforcement career, how many couples have you observed in situations like you've described?

A. Domestic violence couples, you mean?

Q. Yeah.

A. Lots.

. . .

Q. Have you watched and been able to get an idea about who the dominant party is when you deal with these types of situations?

A. Oh, absolutely. Anybody could. Just in talking with the people, they would be able to see who was dominant.

Q. On January 16, were you able to form an opinion as to who you thought was the dominant party?

A. Absolutely. And I did state it in my— in my report, that I felt that Danyel was the—the dominant person in this relationship.

[¶ 38] We have stated that we will closely scrutinize battered woman syndrome testimony presented by the State in its case-in-chief. *Skinner,* ¶¶ 26–27, 33 P.3d at 767; *Ryan v. State,* 988 P.2d 46, 55 (Wyo.1999). We recognize that such testimony may run afoul of the Rule 404(a) prohibition on character evidence to prove that the defendant "acted in conformity therewith on a particular occasion." However, the ban of W.R.E. 404(a) is not absolute. The State is allowed to rebut evidence of character of the accused or the victim presented by the defense. W.R.E. 404(a)(1) and (2).

[¶ 39] Ms. Cazier opened the door to this testimony. She presented evidence that Mr. Cazier engaged in self-injuring behavior on March 16, 2004, and buttressed that claim with evidence that he often acted that way. It is clear that Ms. Cazier introduced such evidence in order to prove that he had acted in conformity with that unusual trait on March 16, 2004. Additionally, she denied being the aggressor on that date. She testified regarding Mr. Cazier's larger size and

greater strength, denying any possible dominance she could have had over her husband. In its rebuttal case, the State was entitled to counter Ms. Cazier's characterizations and denials. One permissible method was to offer opinion evidence of character contradicting the traits that Ms. Cazier had described in Mr. Cazier and denied as to herself. *See* W.R.E. 405(a) ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony . . . in the form of an opinion."); *Duran v. State,* 990 P.2d 1005, 1010–1011 (Wyo.1999).

[¶ 40] Ms. Cazier further claims that the prosecutor erred by emphasizing in closing argument that the couple acted in conformity with their domestic violence roles. The general rule in Wyoming is that a failure to interpose a timely objection to improper argument is treated as a waiver, unless the prosecutor's misconduct is so flagrant as to constitute plain error, requiring reversal. *Belden,* ¶ 38, 73 P.3d at 1087. Having determined that the State was permitted to present opinion evidence of character in its rebuttal case, Ms. Cazier has failed to establish plain error. *Id.* To establish plain error, appellant must demonstrate "violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice." *Id.*

### C) *Vouching for credibility of victim*

[¶ 41] Ms. Cazier claims that Officer Malik improperly vouched for the credibility of the victim, by saying Mr. Cazier looked "like a whipped pup" and "in my mind, I guess, I believed that he had been beat." The description of Mr. Cazier as a "whipped pup" arose during Officer Malik's testimony during the State's case-in-chief when he was describing his contact with Mr. Cazier on March 17, 2004:

[Prosecutor]: When you saw [Mr. Cazier], what was his demeanor?

[Malik]: **I guess I'll say he looked like a whipped pup.** He wouldn't make eye contact. He would always look down. Slumped over. You could hardly under-

stand what he had to say. He was hard to understand.

(Emphasis added.)

There was no objection to the use of the phrase "whipped pup." As the trial progressed, defense counsel pursued a strategy to discredit Officer Malik's conclusions as lacking impartiality and resulting from a hasty and predetermined investigation.

[¶ 42] During the State's rebuttal case, Officer Malik testified concerning his contact with the Caziers in January 2004, prior to his investigation in March. On cross examination, defense counsel questioned Officer Malik regarding his impressions of the Caziers at that time, challenging his ability to read people and interpret relationship dynamics:

> [Defense counsel]: Okay. Assessing the dominant party, how do you tell—by talking to them, is it the one that talks the most?
>
> [Officer Malik]: Well, it's kind of obvious— I think pretty much anybody could see that—that [Mr. Cazier], especially at that point in time, he wouldn't even look at me. I mean, he would look down at his—at the desk. He would look down at his hands. I would ask him a question. I couldn't hardly hear what he had to say. He—he—I think I said this before in the—in the previous hearings, that **he looked like a whipped pup.** That's exactly what he—
>
> Q. I remember that and I was going to ask you that about yesterday. You mentioned when he came in on the 16th—or the 17th of March that he looked like a whipped pup. His head was down, he wouldn't look at you, etc., etc.
>
> A. Um-hum.
>
> Q. And I guess that struck me from reading the affidavits of police officers, like some of you in your agency—I don't know if I've ever read any from you, but they always say—describe those same things. They say from "My training and experience, I know these to be signs of deception." Have you ever read anything like that, looking

away, not making eye contact, looking down at the ground?

> A. Well, we learn to read people and that's not what I read from him. It wasn't deception that I was seeing. This was—he was—he just looked whipped.
>
> Q. But looking at the ground, looking away, not making eye contact, those are things that are taught to you as signs of deception, aren't they?
>
> . . .
>
> A. Well, they can be interpreted that way if they are—like I said, if you are there, you know the difference between what I'm talking about as far as deception and—**and I guess, in a way, he was deceiving me because, in my mind, I guess, I believed that he had been beat.**

(Emphasis added.)

[¶ 43] We analyze Ms. Cazier's claim in terms of plain error because there was no objection at trial to Officer Malik's testimony on the basis of impermissible vouching and also because the prosecution did not pose questions to elicit testimony vouching for Mr. Cazier's credibility. *Mitchell v. State*, 2003 WY 160, ¶ 11, 81 P.3d 180, 183 (Wyo.2003); *Dudley*, 951 P.2d at 1178–79; *Curl v. State*, 898 P.2d 369, 374 (Wyo. 1995). We review the record to determine if the officer is implying that he believed or held an opinion with respect to the victim's version of the events surrounding the assault. *Whiteplume v. State*, 841 P.2d 1332, 1339–40 (Wyo.1992). If the officer intended to impliedly vouch for the truth of the victim's accusations, no corroborating evidence exists, and the central jury issue is the victim's credibility, we will find reversible error when our review of all of the circumstances demonstrates prejudice to the extent that our confidence in the verdict is undermined. *Id.* at 1340–41; *Dudley*, 951 P.2d at 1180.

[¶ 44] Ms. Cazier summarily brands Officer Malik's isolated statements as impermissible vouching, but the record reveals a context for these comments. Officer Malik did not volunteer a belief in Mr. Cazier's version of the events. He was explaining the basis for his opinion that Ms. Cazier was the domi-

nant party, which rebutted her testimony that the violence in the marriage was mutual or was caused by Mr. Cazier. When Officer Malik mentioned the description of "whipped pup," defense counsel was reminded of a line of questioning he had forgotten to pursue during the State's case-in-chief. Defense counsel seized upon that opportunity, attempting to demonstrate what Officer Malik had interpreted could have been consistent with deception by Mr. Cazier. Officer Malik conceded that possibility because in January when Mr. Cazier was reporting that he had inflicted his own injuries, Officer Malik did not find his story believable.

[¶ 45] Officer Malik's expression of belief does not amount to impermissible vouching for the credibility of Mr. Cazier. It did not concern the truth of Mr. Cazier's accusations leading to the felony charge. It pertained to a story told about a different, earlier incident. More importantly, Officer Malik explained that in January he did not believe Mr. Cazier's story. We agree with the State's characterization that Officer Malik's "testimony occurred as a result of defense counsel's questions, and . . . the defense used this testimony as part of the defense strategy to cast doubt upon the credibility of [Mr.] Cazier as a witness and upon the thoroughness and impartiality of [Officer] Malik's investigation." We conclude that impermissible vouching did not occur.

### Sufficiency of the evidence

[¶ 46] Ms. Cazier claims that the evidence was not sufficient to support her conviction of aggravated assault and battery. She asserts that the evidence did not demonstrate that Mr. Cazier suffered "serious bodily injury" or that his injuries resulted solely from the events of March 16, 2004. In considering Ms. Cazier's challenge to the sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Davis v. State*, 2005 WY 93, ¶ 37, 117 P.3d 454, 469 (Wyo.2005). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Davis*, ¶ 37, 117 P.3d at 469.

[¶ 47] The jury was instructed on the elements of aggravated assault and battery as follows:

The elements of the crime of Aggravated Assault and Battery, as charged in Count II of this case, are:

1. On or about the 16th day of March, 2004
2. In the County of Lincoln, State of Wyoming
3. The Defendant, Georgina Danyel Cazier
4. Intentionally or knowingly
5. Caused serious bodily injury to Chad Cazier
6. Under circumstances which showed an extreme indifference to the value of human life.

The jury was instructed that

"[s]erious bodily injury" means bodily injury which creates a substantial risk of death or which causes miscarriage, severe disfigurement or protracted loss or impairment of the function of any bodily member or organ.

This definition of serious bodily injury is that provided in Wyo. Stat. Ann. § 6–1–104(a)(x) (LexisNexis 2003).

[¶ 48] Evidence favorable to the State demonstrated the extraordinary circumstances of the cable whipping Mr. Cazier endured on March 16, 2004. He described how he had been viciously beaten for an extended period of time, perhaps two hours. Evidence was presented that Mr. Cazier had to be hospitalized for several days. The beating caused chemical abnormalities in Mr. Cazier's body. Dr. Stibor testified that he "literally couldn't believe" what he saw. According to Dr. Stibor, Mr. Cazier's injuries were "extremely remarkable," "significant," and it was apparent that he had been "whipped." The jury viewed photos of the injuries taken on March 17, 2004. The photos depict numerous wounds inflicted to his body, face, and head. Mr. Cazier removed his shirt to show the jury the scarring he had suffered. Although we do not know the se-

verity of what the jury saw on Mr. Cazier's back and torso, scars were apparently visible more than eight months after the whipping. We are not in a position to second guess the jury's evaluation of Mr. Cazier's scars, and, viewing the evidence in a light most favorable to the State, we accept that notable scarring was demonstrated. We conclude that such evidence could have allowed the jury to conclude that Mr. Cazier had, at a minimum, suffered severe disfigurement.

[¶ 49] Despite this evidence, Ms. Cazier asserts that the jury could not have determined which of Mr. Cazier's injuries were sustained on March 16, 2004. In a separate count, Ms. Cazier was also charged with aggravated assault and battery for similar conduct allegedly occurring on March 11, 2004. Because the jury found Ms. Cazier not guilty of the March 11, 2004 charge, she reasons that the evidence was insufficient to demonstrate that any, or all, of the injuries the jury considered had been inflicted on March 16, 2004. However, the jury viewed the photos of Mr. Cazier taken on March 17, 2004, and heard Dr. Stibor's testimony that on that date most of the injuries appeared to be "fresh." Although Ms. Cazier denied any sort of confrontation with her husband on March 11, 2004, she admitted that she used the cables to repeatedly hit her husband on March 16, 2004. After Mr. Cazier did not return home on March 17, 2004, she wrote a note apologizing to him the next day, which said: "Chad, I'm sorry I was going to tell you that the other night and then you never came home. We can work this out and I'll get help. I've decided that I don't want to loose [sic] you." Mr. Cazier never returned to the home, but Officer Malik found the note on the kitchen counter, resting on top of the cables. We conclude that the evidence was sufficient to allow the jury to conclude that Mr. Cazier's injuries had resulted from the beating on March 16, 2004.

### Cumulative error

[¶ 50] In the absence of a finding of any error, Ms. Cazier's claim of cumulative error must fail. *Thomas v. State,* 2006 WY 34, ¶ 38, 131 P.3d 348, 359 (Wyo.2006); *Bhutto v. State,* 2005 WY 78, ¶ 35, 114 P.3d 1252, 1265 (Wyo.2005); *Luedtke v. State,* 2005 WY 98, ¶ 36, 117 P.3d 1227, 1234 (Wyo.2005).

[¶ 51] Affirmed.