2010 WY 14

**Jason Gerald PHILLIP, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–09–0080.**

Supreme Court of Wyoming.

Feb. 12, 2010.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] Jason Gerald Phillip (the appellant) was involved in a bar fight, during which he bit off a piece of a fellow patron's ear. As a result of this incident, he was charged with and convicted of aggravated assault and battery. On appeal, he claims that the district court erred in instructing the jury regarding an aggressor's forfeiture of a self-defense claim, asserting that there was no evidence showing that he was the aggressor in the altercation. The appellant also asserts that an Affidavit of Indigency, containing statements inconsistent with his in-court testimony, should not have been admitted into evidence. He argues that the inconsistent statements were inadmissible inasmuch as they involved collateral matters and that they resulted in an erroneous application of the *falsus in uno, falsus in omnibus* maxim. Finally, he contends that the admission of the affidavit resulted in an abridgement of his constitutionally protected right to equal protection, his Fifth Amendment right against self-incrimination, and his Sixth Amendment right to counsel. Finding no abuse of discretion or other error, we will affirm.

## ISSUES

[¶ 2]  1.  Did the district court err when it gave the jury an instruction regarding an aggressor's right to self-defense?

2.  Did the district court err when it admitted into evidence the appellant's Affidavit of Indigency for impeachment purposes?

## FACTS

[¶ 3]  This matter arose out of a fight that occurred in a bar in Casper, Wyoming, on July 18, 2008. During the altercation, the appellant bit off a piece of the ear of another patron, and as a result was charged with one count of aggravated assault and battery. The appellant pled not guilty and a jury trial was held. The jury found the appellant guilty as charged. The appellant timely appealed.

## DISCUSSION

### *Did the district court err when it gave the jury an instruction regarding an aggressor's right to self-defense?*

[¶ 4]  The appellant did not object at trial to the instruction to which he now takes exception. Therefore, we review the

appellant's claim under the three-part plain error analysis.

> First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, appellant must prove that he was denied a substantial right resulting in material prejudice against him.

*Ogden v. State,* 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo.2001) (quoting *CB v. State,* 749 P.2d 267, 268–69 (Wyo.1988)).

[¶ 5] At trial, the jury received Instruction No. 15 from the district court. It read:

> YOU ARE INSTRUCTED that generally, the right to use self-defense is not available to one who is the aggressor or provokes the conflict. However, if one who provokes a conflict thereafter withdraws from it in good faith and informs his adversary by words or actions that he wants to end the conflict, and he is thereafter pursued or attacked, he then has the same right of self-defense as any other person.

When reviewing claims involving jury instructions, we review the instructions

> as a whole without singling out individual instructions or parts of them. *Ellison v. State,* 3 P.3d 845, 849 (Wyo.2000). We give the trial courts great latitude in instructing the jury. *Merchant v. State,* 4 P.3d 184, 190 (Wyo.2000). We "will not find reversible error in the jury instructions as long as the instructions correctly state the law and the entire set of instructions sufficiently covers the issues which were presented at the trial." *Id.* (quoting *Harris v. State,* 933 P.2d 1114, 1126 (Wyo.1997)).

*Coburn v. State,* 2001 WY 30, ¶ 9, 20 P.3d 518, 520 (Wyo.2001). There is no question Instruction No. 15 is a correct statement of Wyoming law. In fact, the instruction is the exact language found in Wyoming Criminal Pattern Jury Instruction 8.04. However, our inquiry does not end there. Specifically,

when reviewing the propriety of a self-defense instruction, we have said the following:

> It is initially the court's obligation to determine whether there is evidence before the jury from which it could infer that the defendant was at fault and be regarded as an aggressor and deprive himself of the right of self-defense. The instruction cannot be given as a matter of course in every case involving a claim of self-defense.

*Cullin v. State,* 565 P.2d 445, 450–51 (Wyo. 1977) (internal citations omitted).

[¶ 6] The appellant argues that the district court abused its discretion in giving Instruction No. 15, claiming that there was no evidence presented at trial that supported a finding that he was the aggressor in the conflict. Specifically, the appellant claims the only evidence against him was that "he was a person of color with an insufficiently deferential tone toward the white person who attacked him." The record does not support this assertion.

[¶ 7] With regard to the evidence that the defendant was the aggressor, the district court specifically commented as follows during the instruction conference: "And in this case, there is certainly plenty of evidence from which both sides can argue as to who was or wasn't the aggressor and who was or wasn't defending themselves and whether or not the force necessary—or the force used was necessary." Our review of the record supports the district court's finding. The victim described the circumstances leading up to the altercation as follows:

> [THE PROSECUTOR:] And there—did there become [sic] a time where you stood up from your seat?
>
> [THE VICTIM:] Yeah, that's when the argument really started to escalate.
>
> Q. All right. Why do you say the argument was really escalating at that point?
>
> A. Cause you could kind of tell that it was—it was going—it wasn't going to continue with, Oh, hey, you know, we're okay now and let's shake hands and have a drink. You could tell it was going to

continue on to a more aggressive manner.

Q. And as you stood up, could you tell the ladies and gentlemen of the jury where your back was?

A. Yeah, I was—when I had stood up, the chair swivels, you know. So I swiveled out towards the opening and had stood up, and my back was facing the bar at the time, three feet away from the bar.

Q. Okay. So you're facing the patrons?

A. Well, I was facing—my back was facing the bar.

Q. All right. And using Exhibit 3 again, can you illustrate where he was when you stood up and had your back on the bar?

A. I—I believe that the other picture would be better.

Q. All right. The first exhibit?

A. Yes, sir.

Q. And this is Exhibit 1, for the record.

A. He was standing just right here in this area. If my back was facing the bar, it would be a little more towards the—right around this table area here he was standing.

. . . .

Q. Can you tell us approximately how many feet away?

A. Five at the max, probably. He—at the time there was enough distance where [the bar owner] was standing, and it was about a body length. And he was telling him, you know, this is—you need to chill out. Let's just call it done. So there was, like, enough room for one person in between us.

Q. All right. And when [the bar owner] came over, did that end this argument?

A. Not really. I mean, he continued to kind of argue with [the bar owner] a little bit and, like, I wasn't saying anything. I wasn't behind [the bar owner], you know. I was just standing there, kinda.

Q. And when [the bar owner] walked away, did the argument continue?

A. When [the bar owner] turned away, he came—come [sic] towards me.

. . . .

Q. And when [the bar owner] walked away, did this argument then become physical?

A. Yes, sir.

Q. And how long did it take after [the bar owner] walked away before it became physical?

A. He had come towards me, I mean, directly as [the bar owner] had turned. And I felt—I felt threatened, you know. I mean—

Q. Well, let's talk about that for a minute. What do you mean he came at you?

A. He had come towards me and, you know, not a—not a hey-let's-shake-hands manner. You know, it was—he had come towards me, not to be friends with me.

Q. How would you describe his walk or—

A. It was definitely aggressive. I mean, it wasn't like he took off jogging after me. There was [sic] only five steps, but it was an aggressive stride.

Q. What did you think was about to happen?

A. I definitely felt that we were going to end up fighting right then and definitely intimidated—you know, I was intimidated by it.

Q. And let's talk about the physical size for a moment. How tall are you, sir?

A. 5-9.

Q. And how much do you weigh?

A. 180 pounds, roughly.

Q. And he comes at you. What do you do?

A. I—I jabbed him.

The prosecutor reminded the jury about this testimony in his rebuttal closing statement, when he said:

Let's talk about the punch. [Defense Counsel] says, [W]ell, you know, it's kind of out of the blue, wham. What'd you hear from [the victim]? He's coming at me. Well, why'd you punch him? I was threatened. I was scared and here he

come[s]. The fight's on. He talked about aggressive walks.

[¶ 8] There is no dispute that the appellant and the victim had been engaged in a verbal confrontation, based on the appellant's, the victim's, and the witnesses' testimonies. It is also not disputed that the victim threw the first punch. However, the record also shows the victim testified he only punched the appellant after the appellant came toward him in an aggressive manner. In instances such as that presented here, where opposing parties claim the other was the aggressor, "our task is not to weigh the evidence, [but] only to determine whether the district court could reasonably conclude that there was competent evidence from which the jury might find [the party claiming self-defense] was the aggressor." *Causey v. State,* 2009 WY 111, ¶ 13, 215 P.3d 287, 292 (Wyo.2009). Instruction No. 15 is a correct statement of Wyoming law, and we find that the jury was presented with testimony that could reasonably support a finding that the appellant was the aggressor in these circumstances. Therefore, the appellant has failed to show a violation of a clear and unequivocal rule of law, thereby failing to prove plain error.

### Did the district court err when it admitted into evidence the appellant's Affidavit of Indigency for impeachment purposes?

[¶ 9] At trial, the appellant testified that the interaction between him and the victim escalated after the appellant was challenged as to the value of his jewelry. On direct examination, the appellant stated:

A. .... I usually wear a lot of jewelry, all right? And the only thing I have on today is my watch. And they started asking about my rings and, you know, stuff like that, "Oh, it's fake." And—
[DEFENSE COUNSEL:] And you say "they." Who do you mean when you say "they?"
A. [The victim] and his friends.
Q. Okay.
A. And I'm like, "Bro, I don't buy anything that's fake." All right? I don't make a 100,000, 125 grand a year to buy,

like, silver or something that's fake, you know. So they started laughing at me. All right?

On cross-examination, the prosecutor questioned the appellant regarding what he perceived as inconsistencies between the appellant's testimony and information sworn to in the appellant's Affidavit of Indigency. Specifically, the prosecutor pointed out that the appellant swore in his affidavit that he owned only $100.00 worth of jewelry and his last paycheck was only $2,300.00, both statements being inconsistent with his in-court testimony that he owns a lot of jewelry that is not fake and that he earns in excess of $100,000 per year. The appellant's counsel objected to the admission of the Affidavit of Indigency on relevancy grounds, which objection was overruled.

### Standard of Review

[¶ 10] The appellant contends that the Affidavit of Indigency containing prior inconsistent statements should not have been admitted into evidence. Because the appellant's counsel properly objected to the introduction of the affidavit, we will review the district court's decision to allow the evidence for an abuse of discretion.

A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.

*Wimbley v. State,* 2009 WY 72, ¶ 10, 208 P.3d 608, 611 (Wyo.2009) (internal quotation marks and citations omitted). In addition to the general admissibility issue raised, the appellant argues on appeal that reversible error occurred when the inconsistencies between the affidavit and his trial testimony were used to invoke the *falsus in uno, falsus in omnibus* maxim. Finally, the appellant contends that the admission of the affidavit resulted in a violation of certain constitutionally protected rights. Because these claims were not the subject of an objection below, we will address them under the plain error standard of review articulated above.

### Prior Inconsistent Statements

[¶ 11] Before addressing the appellant's constitutional and other arguments, we first must determine whether the district court abused its discretion in allowing the Affidavit of Indigency into evidence. The affidavit contained a sworn statement which was inconsistent with the appellant's trial testimony. "Showing that a witness made statements inconsistent with his testimony is one of five recognized means of impeachment." Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:99 (2007); *Diamond Mgmt. Corp. v. Empire Gas Corp.*, 594 P.2d 964, 969 (Wyo.1979). Regarding impeaching a witness using a prior inconsistent statement, we have said that "[t]he purpose of this type of impeachment evidence is to show a witness to be generally capable of making errors in his testimony. In doing so, counsel can resort to the witness' own prior statements in which that witness has given a contrary version." *Willis v. State*, 2002 WY 79, ¶ 18, 46 P.3d 890, 896 (Wyo.2002) (citations omitted). The admissibility of evidence of prior inconsistent statements for impeachment purposes is not without limits, however. We have said that all impeachment is subject to the rule against impeachment on collateral matters.

> Generally speaking, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witness. However, the cross-examiner may not impeach a witness on a collateral matter. Collateral matters are generally considered to include facts irrelevant to the substantive issues in the case and facts which are not independently provable by extrinsic evidence, apart from impeachment purposes. The test which determines if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict.

*Law v. State*, 2004 WY 111, ¶ 22, 98 P.3d 181, 189 (Wyo.2004) (quoting *People v. Hutson*, 223 Ill.App.3d 50, 165 Ill.Dec. 541, 584 N.E.2d 975, 978 (1991)).

[¶ 12] Application of the "collateral matters" rule is somewhat more relaxed, however, when applied to prior inconsistent statements:

> Using prior inconsistent statements to impeach is subject to the rule against impeachment on collateral matters, although the rule is not enforced with much rigor. Prior inconsistent statements indicate self-contradiction, which seems a somewhat more serious matter and one that merits some explanation, than counterproof from wholly independent sources, so courts allow somewhat more leeway to use prior statements. Still, if a prior statement tends neither to undermine an assertion by the witness on some substantive point in the case nor to demonstrate or refute bias, capacity, or truthful disposition on the part of the witness, then the statement relates to a collateral matter and may be excluded.

Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:99 (2007). Finally, the same authority notes the significance of prior inconsistent statements to the credibility determination:

> The rule against contradicting on collateral matters also has less bite when the contradiction proceeds through questions about (even using other witnesses to prove) prior inconsistent statements by the witness being attacked. Here, after all, the witness has contradicted himself, and this fact has some independent significance in appraising his credibility.

*Id.* at § 6:89. Furthermore, before extrinsic evidence of prior inconsistent statements may be admitted, W.R.E. 613(b) requires that certain procedural safeguards be observed.

> (b) *Extrinsic evidence of prior inconsistent statement of witness.*—Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a

party-opponent as defined in Rule 801(d)(2).

[¶ 13] The appellant does not argue that the Affidavit of Indigency was admitted in contravention of W.R.E. 613(b).[1] Instead, the appellant contends that his prior inconsistent statements were inadmissible because they represented impeachment on collateral matters. Specifically, the appellant asserts that while there were inconsistencies between his in-court statements and those made in the affidavit, "[n]one of these facts had anything to do with the facts of consequence to the determination of the action." We disagree.

[¶ 14] As explained above, evidence of a prior inconsistent statement is not collateral if it could be admissible for some purpose other than to contradict, or if it demonstrates or refutes the truthful disposition of a witness (see supra ¶¶ 11–12). We have held that "when a defendant in a criminal action takes the witness stand in his own defense, his credibility becomes an issue . . . ." Montez v. State, 670 P.2d 694, 696 (Wyo.1983). "Credibility of witnesses is always a question of fact for the trier of fact to determine." Barnes v. State, 858 P.2d 522, 534 (Wyo. 1993). The evidence of the prior inconsistent statement here was offered, admitted, and ultimately used for the purpose of challenging the appellant's credibility.[2] Furthermore, it is conceivable that the Affidavit of Indigency and the statements contained therein would have been independently admissible for purposes other than to show contradiction. Finally, whether evidence was collateral is a question primarily left to the discretion of the district court and, upon reviewing the entire record, we cannot say that the district court abused its discretion in admitting the affidavit. See State v. Shaffer, 114 Ohio App.3d 97, 682 N.E.2d 1040, 1044

(Ohio App.3d 1996) ("The decision whether to admit a prior inconsistent statement which is collateral to the issue being tried and pertinent to the credibility of a witness is a matter within the sound discretion of the trial judge.").

### Falsus in Uno, Falsus in Omnibus

[¶ 15] The appellant next contends that the district court erred when it allowed the prosecutor to use the inconsistencies in his testimony to invoke the *falsus in uno, falsus in omnibus* maxim—which translated is "false in one thing, false in all." *Parkel v. Union Pac. Coal Co.*, 69 Wyo. 122, 128, 237 P.2d 634, 636 (Wyo.1951).

> Under the maxim, falsus in uno, falsus in omnibus, as strictly interpreted, if a witness testifies falsely as to any one material part of his testimony, his testimony should be discarded as a whole, and cannot be relied on for any purpose whatever, unless strongly corroborated; but this rule is not inflexible.

*Id.* (quoting 70 C.J. *Witnesses* § 969 (1935)). Although we have previously recognized and applied this maxim, see *Montez v. State*, 527 P.2d 1330, 1332 (Wyo.1974); *Parkel*, 69 Wyo. at 128, 237 P.2d at 635–636; *Haywood v. Kukuchka*, 55 Wyo. 41, 46–47, 95 P.2d 71, 72 (Wyo.1939); *Rue v. Merrill*, 42 Wyo. 511, 525–26, 297 P. 379, 384–85 (Wyo.1931), the concept has been subject to criticism. Addressing the maxim, Professor Wigmore had the following comment:

> It may be said, once for all, that the maxim is in itself worthless;—first, in point of validity, because in one form it merely contains in loose fashion a kernel of truth which no one needs to be told, and in the others it is absolutely false as a maxim of life; and secondly, in point of

---

1. The record is clear that the procedural safeguards of W.R.E. 613(b) were properly observed. The appellant was presented with a copy of the Affidavit of Indigency and given the opportunity to explain the inconsistencies between his in-court statement and his sworn statements in the affidavit during both cross-examination and redirect examination.

2. Inconsistent statements admitted only for impeachment purposes should be considered by the

jury only for the limited purpose offered. See *Medrano v. State*, 914 P.2d 804, 809 (Wyo.1996); *Channel v. State*, 592 P.2d 1145, 1149–50 (Wyo. 1979). Upon request, a defendant is entitled to a jury instruction setting forth the limited purposes of the testimony. *Cazier v. State*, 2006 WY 153, ¶ 34, 148 P.3d 23, 34 n. 6 (Wyo.2006). In the absence of such a request, we cannot find fault with the district court for not giving a limiting instruction. *Id.*

utility, because it merely tells the jury what they may do in any event, not what they must do or must not do, and therefore it is a superfluous form of words.

IIIA John H. Wigmore, *Evidence* § 1008 (Chadbourn rev. 1970).

[¶ 16] The appellant asserts that the *falsus in uno* concept was expressed in Jury Instruction No. 4, which included the language from Wyoming Criminal Pattern Jury Instruction 1.02 and read:

> If you believe from the evidence in this case that any witness willfully and corruptly swore falsely to any material fact in this case, then you are at liberty to disregard all or any part of that testimony, except insofar as the same has been corroborated by other and credible evidence, and the facts and circumstances proven during the trial.

The appellant then directs us to statements made during closing argument wherein the prosecutor stated:

> Ladies and gentlemen, you saw State's Exhibit 32; it's a pauperis form or public defender form that people fill out and perhaps you thought, why is that important?
>
> Ladies and gentlemen, the defendant took an oath, first few lines of it. The following information is the truth, the whole truth, and nothing but the truth, when he filled it out.
>
> Did he fill it out correctly? No. He lied about his address, about the worth of his jewelry, his paycheck. He'll tell everyone at the bar and he'll tell everyone on direct, "I make $125,000 a year." Look at how much he makes on the form. When he wants something, ladies and gentlemen, he'll tell you what he wants, and he hopes you want to hear it. He wanted [the public defender], and he filled out the form so he could get her.
>
> Ladies and gentlemen, Instruction Number 4 tells you you can disregard a person's testimony if you believe it was false.
>
> Look at Exhibit 32 when you start judging his testimony. It's something—he told you something he wants you to

hear and wants you to believe. But is it the truth? It's a very difficult question. It's a very difficult question for all of us. Where is the truth and how do you judge it?

. . . .

> Look at the photos of both the victim and the defendant. And I want to paint him in a bad light? No. I want to get to the truth. Under oath, he was deceptive on his public defender form to get what he wanted and he asks you to believe him now. You get to judge that.

[¶ 17] The appellant claims that Jury Instruction No. 4 and the prosecutor's reference thereto resulted in an erroneous application of the *falsus in uno* maxim because the inconsistent prior statements were not related to a material fact. It is true that the maxim should only be applied, if applied at all, where a witness falsely testifies to a material fact. However, under the facts presented here, we cannot say that Jury Instruction No. 4, and the prosecutor's related comments, resulted in plain error inasmuch as we question whether the *falsus in uno* maxim, as a separate legal concept, was ever even considered by the jury. Jury Instruction No. 4, which was a general instruction and not given as a result of, or in relation to, the appellant's prior inconsistent statement, merely told the jury it was at **liberty to disregard any** witness's testimony if it believed from the facts that the witness's testimony was false. Likewise, the prosecutor never told the jury that it must disregard all of the appellant's testimony because of the inconsistencies, as required by strict application of the *falsus in uno* maxim. Rather the prosecutor merely referenced the inconsistencies and told the jury it may consider such inconsistencies when judging the appellant's credibility. We have said that "[c]ounsel are allowed wide latitude during the scope of their closing arguments, and a prosecutor may comment on all of the evidence in the record and suggest reasonable inferences from that evidence." *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo.2007).

[¶ 18] Given the state of the record as it relates to the alleged error, we are unable to say that the appellant met the first prong of

plain error analysis. That is, the record does not clearly present the incident alleged to be error. We find that the *falsus in uno* maxim was never plainly invoked in either the jury instruction or in the prosecutor's comments. To find otherwise would require us to speculate and assign meaning not expressly conveyed in either instance. Furthermore, even if the jury was erroneously instructed on the *falsus in uno* concept, the appellant fails to point to anything in the record showing that the jury applied this maxim to his prejudice. The jury may have assigned more weight to the victim's version of the events, or found the state's evidence to be more credible; however, nothing in the record indicates that the jury disregarded all or even part of the appellant's testimony. Therefore, the appellant also fails to satisfy the prejudice requirement of the plain error test.

### Constitutional Arguments

[¶ 19] In his final arguments concerning the admissibility and use of the Affidavit of Indigency, the appellant contends that allowing the affidavit into evidence resulted in a violation of his right to equal protection, his Sixth Amendment right to counsel, and his Fifth Amendment right against compulsory self-incrimination. We will discuss each argument briefly below.

[¶ 20] The appellant asserts the admission of the Affidavit of Indigency violated his constitutionally protected right to equal protection by implicitly revealing to the jury that he was represented by a court-appointed attorney. The appellant contends that as an indigent, he was wrongfully subjected to ill feelings, resentment, and a general belief that those who are represented by public defenders are more likely to be guilty than those represented by retained counsel. The appellant cites no authority holding that that admission of an indigency affidavit, under the circumstances and for the purpose presented here, amounts to a violation of law. In fact, the only authority the appellant cites involves a defendant being presented to a jury in prison clothing and shackles—clearly a different scenario than the present. Furthermore, the appellant provides no support for his statements that the public is resentful of

defendants represented by court-appointed counsel and automatically assume the individual is guilty. Without more, the appellant is unable to satisfy the requirements of the plain error standard of review. While it is clear from the record that the affidavit was used at trial, the appellant fails to show a violation of a clear and unequivocal rule of law or that he was unfairly prejudiced.

[¶ 21] Next the appellant claims that admission of the Indigency Affidavit resulted in a violation of his Fifth Amendment right against self-incrimination. We find it difficult to discern the thrust of the appellant's argument inasmuch as he does not specify what information contained in the affidavit might have been incriminating. The appellant cites one tangentially related case and then concludes, without analysis or argument, that that case should govern here. The case cited, *United States v. Hardwell,* 80 F.3d 1471 (10th Cir.1996), is readily distinguishable from the present case. In *Hardwell,* the defendant was convicted of money laundering. *Id.* at 1479. The prosecution introduced the defendant's financial affidavit into evidence in its case in chief as substantive evidence of the fact the defendant did not have a legitimate source of income. *Id.* at 1483. The lack of a legitimate source of income was a key element to the money laundering charge. *Id.* The court held such use of that evidence violated the defendant's Fifth Amendment right against self-incrimination. *Id.* at 1484.

[¶ 22] Here, in contrast, the affidavit was not used as substantive evidence, but only for purposes of impeachment, and not until the appellant was testifying during the presentation of his case. The United States Supreme Court has held that such a use is proper and not in contravention of a defendant's Fifth Amendment rights. In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court held that voluntary statements made by a defendant, although later deemed inadmissible as substantive evidence by the Fifth Amendment, could be used as impeachment evidence against the defendant if he testifies. *Id.* at 226, 91 S.Ct. at 646. Addressing the admissibility of evidence obtained in violation of *Miranda v. Arizona,*

384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court pointed out that:

> *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

*Harris,* 401 U.S. at 224, 91 S.Ct. at 645. In holding the substantively inadmissible statements could be used for impeachment purposes, the Court stated:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

*Id.* at 225, 91 S.Ct. at 645–46 (citation omitted). The Court succinctly concluded by explaining: "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." *Id.* at 226, 91 S.Ct. at 646.

[¶ 23] We agree with the reasoning in *Harris.* As a result, we find it unnecessary to determine whether the evidence admitted via the Affidavit of Indigency was obtained in violation of the appellant's Fifth Amendment rights inasmuch as the evidence here was used only for impeachment purposes.

[¶ 24] Finally, the appellant contends that his Sixth Amendment right to counsel was violated when he was compelled to answer the questions on the Affidavit of Indigency without counsel present. Once again, it is unnecessary for us to determine whether the appellant's right to counsel was, or was not, abridged here inasmuch as the same principle discussed above in the Fifth Amendment discussion applies in the context of an alleged Sixth Amendment violation. That is, even if the evidence was unlawfully obtained because a defendant's right to counsel was not properly observed, the evidence may still be used for impeachment purposes. Recognizing the decision and rationale in *Harris,* the United States Supreme Court, in *Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), a case addressing a violation of a defendant's right to counsel, stated:

> The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections. But use of statements so obtained for impeachment purposes is a different matter. If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal obligation to speak truthfully and accurately, and we have consistently rejected arguments that would allow a defendant to turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Id.* at 351, 110 S.Ct. at 1180 (internal quotation marks and citations omitted). In the present case, because the evidence contained in the affidavit was used only for impeachment, the appellant's claim that he was denied his right to counsel must necessarily fail.

## CONCLUSION

[¶ 25] We find that evidence in the record could reasonably support the jury's conclusion that the appellant was the aggressor in the altercation; therefore the district court did not err when it instructed the jury regarding an aggressor's forfeiture of his right to self-defense. We also find that the Affidavit of Indigency was properly admitted as a prior inconsistent statement under W.R.E. 613(b), and that the district court did not abuse its discretion in admitting the affidavit. We further hold that the appellant was un-

able to satisfy his burden of showing that the jury was erroneously instructed on the *falsus in uno, falsus in omnibus* maxim, or that even if so instructed, that he was prejudiced thereby. Finally, we conclude that the appellant failed to demonstrate that the admission of the Affidavit of Indigency resulted in an abridgement of his constitutionally protected right to equal protection, his Fifth Amendment right against self-incrimination, or his Sixth Amendment right to counsel.

[¶ 26]   Affirmed.