2012 WY 107

**Donald E. INMAN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–11–0211.**

Supreme Court of Wyoming.

Aug. 7, 2012.

Representing Appellant: Robert J. O'Neil, Attorney at Law, Gillette, Wyoming.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; David L.

Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Meri V. Geringer, Senior Assistant Attorney General. Argument by Ms. Geringer.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Donald Inman (Inman) appeals his aggravated assault and battery conviction. Inman did not deny that he assaulted the victim, but claimed he acted in defense of himself and his family. On appeal, Inman asserts the district court erred in allowing a detective to provide lay opinion testimony as to the location of the assault. He also asserts the district court erred in denying his motions for judgment of acquittal, arguing that the victim's testimony was contradictory and so inherently unreliable that a reasonable juror could not have accepted the victim's version of events and rejected Inman's claim of self defense. We affirm.

### ISSUES

[¶ 2] Inman presents the following issues on appeal:

1. The denial by the Honorable District Judge John R. Perry of Defendant's Motion in Limine: WRE 701 dated January 5, 2011 and the admission of improper lay opinion evidence of Gillette Detective Becky Elger; and

2. The denial by the Honorable District Judge John R. Perry of Defendant's Motion for Judgment of Acquittal—Criminal Rule 29(c) dated March 25, 2011.

### FACTS

[¶ 3] On September 14, 2010, Jerrod Wilson (Wilson) moved from Oklahoma to Gillette, Wyoming, with his wife and their infant son. Wilson's wife is Inman's sister, and when they arrived in Gillette, the Wilsons stayed with Inman in an apartment that he shared with his girlfriend and their two children.

[¶ 4] On September 17, 2010, Inman and Wilson went together to run an errand and to a bar to celebrate Wilson's new job. Over the course of about two hours, Inman drank two to three beers, and Wilson drank four beers and two shots of hard liquor. While they were drinking, Wilson told Inman that he had broken his wife's nose, pushed her down when she was pregnant, and had been unfaithful to her. Inman testified:

A. He told me about the stuff that happened with my sister in the past, about the times he hit her and broke her nose. And I believe he pushed her down when she was pregnant. And then I believe he said he was—hadn't been faithful as well.

Q. How did that make you feel?

A. Uneasy and not good, but, you know, I was still wanting to give him the benefit of the doubt. He came up here for a new start, and I was going to give it to him.

Q. How was his attitude about telling you about these things about your sister?

A. It sucked when he was talking about it. It's like he had like an I—don't—care attitude. It was real—it disturbed me. It really did. It was a really shitty attitude.

Q. Did you think those things were a big deal?

A. Yes. That's my sister. Yeah. Yeah.

* * * *

Q. How was the ride back to your apartment?

A. It was pretty quiet. We really didn't talk much. I didn't want to talk to him that much to tell you the truth.

[¶ 5] When the two men returned to Inman's apartment, Wilson began arguing with his wife, who was upset with him for being gone too long. Inman intervened in the argument, exchanged words with Wilson, and ordered Wilson to leave the apartment. Wilson left the apartment and went to the parking lot of the apartment building. He sat down by a dumpster, became cold, and yelled to Inman, who was standing outside on the balcony, to throw him a jacket. Inman refused.

[¶ 6] Inman and Wilson provided different accounts of how the assault occurred. Inman testified that Wilson came back to the apartment, which was on the building's sec-

ond floor, and began yelling, and banging and kicking on the door. Inman feared for the safety of his family and himself because of the way Wilson was acting and because he knew of Wilson's prior abusive behavior and that Wilson had been diagnosed with a bipolar condition. Inman grabbed a pipe from near the apartment's front door. He described the pipe as a safety rod with a V on one end that fits under a door handle and a sharp plastic tip on the other end that grips the carpet. Inman opened the apartment door and Wilson fled through the stairwell door and down the stairs. Inman chased Wilson down the stairs to make sure he left. When Inman reached the landing between the two sets of stairs, Wilson turned and charged back toward Inman, which was when Inman struck Wilson on the head with the pipe.

[¶ 7] Wilson told a different version of events. He testified that when Inman would not throw a jacket to him from the balcony, he came back in the building to get the jacket. Wilson was just inside the building's entrance door on the main floor, when Inman came down the stairs carrying a pipe. Inman threatened Wilson with the pipe, and Wilson told Inman he just wanted a jacket. Wilson testified that Inman then hit him with the pipe and everything went black.

[¶ 8] Wilson was taken to the hospital by ambulance, and a three-inch laceration to his head was closed with sutures and staples. Because he was lapsing in and out of consciousness, Wilson was kept overnight in the hospital for observation.

[¶ 9] On September 20, 2010, Inman was charged with one count of aggravated assault and battery. On January 3, 2011, Inman filed a motion to dismiss based on the statements contained in a document entitled "Affidavit of Non–Cooperation and Request for Dismissal of Jerrod Wilson." In his affidavit, Wilson attested that he did not remember much about Inman's assault on him because of the amount of alcohol that he had consumed earlier in the evening, and that he no longer wished to cooperate in the prosecution of Inman because Wilson had been acting irrationally that night and Inman struck him

in self defense. The district court denied the motion to dismiss.

[¶ 10] On January 5, 2011, Inman filed a motion in limine seeking to prevent law enforcement officers from testifying, as lay witnesses, to their opinions regarding the physical evidence collected at the scene of Inman's assault. The district court denied the motion, explaining that the testimony at issue was not scientific, that the State had not performed any scientific analysis on the evidence at the scene, and that if the State were to perform such analysis, that information must be provided to Inman who would then be permitted to employ his own experts to verify the analysis.

[¶ 11] A jury trial on the charges against Inman was held on March 14, 2011, through March 15, 2011. At the conclusion of the State's case, Inman moved for a judgment of acquittal. The district court denied the motion, ruling that evidence had been presented on all elements of the charged crime, that the quality of the evidence was such that the case would be allowed to go forward, and that a jury may infer that all of the elements of the crime were proven beyond a reasonable doubt. On March 15, 2011, the jury returned a guilty verdict.

[¶ 12] On March 25, 2011, Inman renewed his motion for judgment of acquittal alleging insufficient evidence to sustain the verdict. On April 5, 2011, the district court denied the motion, finding that "based upon the evidence presented at trial, the fact-finder could have reasonably concluded that the defendant committed the crime charged in the Information."

### STANDARD OF REVIEW

[¶ 13] This Court reviews decisions regarding the admissibility of evidence for an abuse of discretion. *Boucher v. State*, 2011 WY 2, ¶ 40, 245 P.3d 342, 361 (Wyo. 2011).

A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's rul-

ing, that ruling will not be disturbed on appeal.

*Id.* (quoting *Phillip v. State,* 2010 WY 14, ¶ 10, 225 P.3d 504, 509 (Wyo.2010)). "Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary or capricious manner." *Lancaster v. State,* 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo.2002). Further, "[e]ven where a trial objection has been made to the admission of evidence, error cannot be found unless 'a substantial right of the party is affected.'" *Id.,* ¶ 12, 43 P.3d at 87 (citing W.R.E. 103).

[¶ 14] Our standard applicable to review of a denial of a motion for a judgment of acquittal is as follows:

> Our responsibility in considering the propriety of a ruling on a motion for judgment of acquittal is the same as that of the trial court. *Cloman v. State,* Wyo., 574 P.2d 410 (1978). The question raised is the sufficiency of the evidence to sustain the charge, which is a matter to be determined within the sound discretion of the trial court. *Chavez v. State,* Wyo., 601 P.2d 166 (1979); *Montez v. State,* Wyo., 527 P.2d 1330 (1974). In making that determination the district court must assume the truth of the evidence of the State and give to the State the benefit of all legitimate inferences to be drawn from that evidence. If a prima facie case is demonstrated when the evidence is so examined, the motion for judgment of acquittal properly is denied. *Russell v. State,* Wyo., 583 P.2d 690 (1978). It is proper to grant a motion for judgment of acquittal only if there is no substantial evidence to sustain the material allegations relating to the offense that is charged. *Heberling v. State,* Wyo., 507 P.2d 1 (1973), cert. denied 414 U.S. 1022, 94 S.Ct. 444, 38 L.Ed.2d 313 (1973); *Fresquez v. State,* Wyo., 492 P.2d 197 (1971). Such a result is indicated if the evidence requires the jury to speculate or conjecture as to the defendant's guilt or if a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime when the evidence is viewed in the

light most favorable to the State. *Chavez v. State, supra; Russell v. State, supra.*

*Taylor v. State,* 2011 WY 18, ¶ 10, 246 P.3d 596, 598–99 (Wyo.2011) (quoting *Martinez v. State,* 2009 WY 6, ¶ 11, 199 P.3d 526, 530 (Wyo.2009)); *see also Benjamin v. State,* 2011 WY 147, ¶ 44, 264 P.3d 1, 12 (Wyo.2011).

## DISCUSSION

### A. *Lay Opinion Testimony of Detective Elger*

[¶ 15] Inman argues that the district court erred in denying his motion in limine and in allowing Detective Becky Elger of the Gillette Police Department to provide opinion testimony based on her observations of the physical evidence found at the scene. Specifically, Inman objects to the admission of Detective Elger's testimony based on his contention that the testimony used the technical terms "trail" and "splatter" and resulted in an opinion, based not on Detective Elger's observations, but based instead on the application of specialized or expert knowledge. Inman cites to the following testimony as impermissible:

Q. And walk us through doing the crime scene. What does that entail?

A. We took photographs. One point there was a video taken. We measured blood spots, picked up pieces of evidence that ultimately came from the end of the pipe that was used. We collected the pipe. We took measurements from the area of the first trail or spot of blood to where the final resting place was, where the blood— the biggest spot of blood was, where the officers stated Mr. Wilson had fallen.

\* \* \* \*

A. This is the hallway. There's a door here goes into the first floor hallway. Then the stairs take off right here, and there's a series of stairs, I think seven or eight of them maybe that come up to a small landing. And then there's another set of stairs that go on up to the second floor. The blood trail went all the way through the door. There was blood on the door and on the doorjamb. Blood in the hall entryway and up to the bottom step of this first set of steps.

* * * *

A. He had—it was in the same trail of blood. Some of it was splatter. Some of it looked like maybe somebody had pushed the door. And it was in the same trail as the blood spots out to the main pool of blood.

* * * *

Q. Based upon your review of where the blood was located and the plastic was located, were you able to determine where the assault occurred?

A. It appeared the assault occurred at the bottom of the staircase on the first landing and entryway of the building.

[¶ 16] Detective Elger's testimony was not offered as expert opinion testimony, but was instead offered and admitted as lay opinion testimony pursuant to Rule 701 of the Wyoming Rules of Evidence. Rule 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

W.R.E. 701.

[¶ 17] In reviewing the history of revisions to the rules of evidence, this Court has observed:

"It was the intent of the framers of the Rules of Evidence to considerably relax the prohibition against receipt of opinion testimony both by expert and lay witnesses. Generally, the rules should be liberally construed to allow the admission of such evidence. * * *"

*Brockett v. Prater*, 675 P.2d 638, 641 (Wyo. 1984) (quoting *McCabe v. R.A. Manning Const. Co., Inc.*, 674 P.2d 699, 705 (Wyo. 1983)).

■ [¶ 18] Under Rule 701, "the witness must have perceived firsthand the pertinent events or matters, and his inferences or opinion must be rationally based on his perception; his testimony must be rejected if his firsthand observation was inadequate to support an opinion." *Tucker v. State*, 2010 WY 162, ¶ 18, 245 P.3d 301, 306 (Wyo.2010) (quoting *Schmunk v. State*, 714 P.2d 724, 735 (Wyo.1986)). We have explained:

Lay opinion testimony is intended "only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." [*United States v.*] *Peoples*, 250 F.3d [630,] 641 [ (8th Cir. 2001) ] (citing *United States v. Cortez*, 935 F.2d 135, 139–40 (8th Cir.1991); *United States v. Figueroa–Lopez*, 125 F.3d 1241, 1244–45 (9th Cir.1997)). In accordance with this principle, we have held that "W.R.E. 701 cannot be read to allow a witness who fails to qualify as an expert to offer opinion testimony 'where the subject in question lies outside the realm of common experience and requires special skill or knowledge.'" *Carroll v. Bergen*, 2002 WY 166, ¶ 21, 57 P.3d 1209, 1217 (Wyo. 2002) (citing *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.*, 843 P.2d 1178, 1190 (Wyo. 1992) (quoting 3 David W. Louisell & Christopher B. Mueller, Federal Evidence § 376 at 419 (Supp.1992))).

* * * *

If a witness's testimony draws on experience beyond the ken of the average person, that witness must meet the qualification requirements of Rule 702.

*Tucker*, ¶¶ 20–21, 245 P.3d at 307.

[¶ 19] In *Tucker*, we found law enforcement testimony crossed the line between lay opinion and expert opinion when a police officer offered his opinion as to the positioning of a vehicle's occupants at the time of an accident. *Tucker*, ¶ 24, 245 P.3d at 308. The testifying officer based his opinion on " 'the factors of the statements I have taken, the victims at the scene, their injuries, the blood splatters, the blood coming from the back and side, [and] the evidence taken for DNA [testing,]' . . . '[and] the secondhand accounts from the witnesses at the bar and the DNA evidence obtained after it was sent to a crime lab for testing.' " *Id.*, ¶ 19, 245 P.3d at 307. The officer also provided accident recon-

struction testimony based on his many hours in basic and advanced accident investigation courses. *Id.*, ¶ 23, 245 P.3d at 308. We concluded:

> The officer's testimony was not proper lay opinion testimony. The testimony was based on matters beyond the officer's personal knowledge or perception, and was based in large measure on the officer's training and experience, which were beyond the ken of the average person.

*Tucker*, ¶ 24, 245 P.3d at 308.

[¶ 20] The testimony of Detective Elger is distinguishable from the testimony this Court found impermissible in *Tucker*. Detective Elger's testimony did not draw on scientific or specialized knowledge or experience, such as the size, shape or angle of individual blood drops, or technical characteristics of the blood trail. Instead, Detective Elger's opinion as to where the assault occurred was based directly on what she observed at the crime scene, that is, the location where she observed blood and pieces of plastic that broke off the weapon. Detective Elger testified to a common sense conclusion from her observations: the blood drops started at Point A and ended in a pool at Point B, where the victim fell, and parts of the weapon were likewise found at Point A, and therefore the assault took place at Point A. We thus conclude that Detective Elger's testimony satisfied the first requirement of Rule 701, that it was rationally based on her perceptions rather than the application of specialized knowledge.

[¶ 21] We further find that Detective Elger's opinion was helpful to the trier of fact, as required by the second prong of Rule 701. Inman testified that he struck Wilson on the landing between the stairs leading from the second floor apartment to the building's first floor, when Wilson charged him on that landing. Wilson, on the other hand, testified that he had just reentered the building and was on the first floor when Inman attacked him with the pipe. Detective Elger's conclusion that the assault occurred on the first floor near the building entrance was thus helpful to the jury in making its determination whether Inman was the aggressor or was acting in self defense.

[¶ 22] Finally, we reject Inman's suggestion that Detective Elger's testimony invaded the province of the jury by allegedly removing the factual determination of self defense. It is certainly true that "a witness, lay or expert, may not express an opinion as to the guilt of the accused." *Cureton v. State*, 2007 WY 168, ¶ 10, 169 P.3d 549, 551 (Wyo.2007). This Court has explained, however, that the proscription against such opinions is a narrow one.

> Opinion testimony, however, is not improper simply because it "embraces an ultimate issue to be decided by the trier of fact." W.R.E. 704. "An interpretation of the evidence by a witness, even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt, is not in the same category as an actual conclusional statement on the guilt or innocence of the accused party." *Saldana v. State*, 846 P.2d 604, 616 (Wyo.1993). Thus, error occurs only where the testimony constitutes a direct opinion about the accused's guilt rather than relates information to assist the jury in resolving the factual issues placed before it.

*Cureton*, ¶ 10, 169 P.3d at 551.

[¶ 23] Detective Elger's testimony was relevant to the ultimate issue of self defense, but it did not express an opinion as to whether Inman acted in self defense. Moreover, her opinion testimony was rationally based on her observations of the crime scene, was not drawn from specialized, technical, or scientific knowledge, and was helpful to the trier of fact. We thus find no abuse of discretion in the district court's admission of the testimony.

## B. *Denial of Motion for Judgment of Acquittal*

[¶ 24] Inman's sole argument in support of his challenge to the denial of his motion for judgment of acquittal relates to the contradictions between Wilson's pretrial affidavit and his trial testimony. Inman contends in his brief that "the testimony of Mr. Wilson is of such poor quality that no reasonable juror could believe it and consequently

reject the claim of Appellant of self-defense and defense of others beyond a reasonable doubt." We reject Inman's argument because it ignores our standard for reviewing the denial of a motion for judgment of acquittal, most particularly, the requirement that we accept the State's evidence as true. *See Benjamin,* ¶ 46, 264 P.3d at 12 ("We keep in mind, as we evaluate this claim, that we 'accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant.'") (quoting *Najera v. State,* 2009 WY 105, ¶ 5, 214 P.3d 990, 992 (Wyo.2009)).

[¶ 25] The record is clear that Wilson's pretrial affidavit, prepared by Inman's counsel, contradicts Wilson's trial testimony. Wilson testified, however, concerning his signing of the affidavit and the differences between his trial testimony and the affidavit. He testified that the affidavit came in the mail and that he did not prepare the document himself or provide any of the information that was contained in the affidavit. He further testified that he signed the document without reading it, that he signed it because he believed that he then would not be required to testify, and that his trial testimony, not what was stated in the affidavit, was a true account of what happened the night of September 17, 2010. Consistent with this testimony, Wilson's wife testified that Inman told her that if Wilson would sign the affidavit, Wilson would not be required to testify. She also testified that this is what she then told Wilson. Wilson's wife further testified that Inman's girlfriend drove them to the office of Inman's attorney to sign the affidavit.

[¶ 26] If we accept the State's evidence, including Wilson's testimony concerning the affidavit, as true, the record contains sufficient evidence from which the jury could have accepted Wilson's version of events and rejected Inman's self-defense claim. Moreover, even if the jury rejected Wilson's version of events, and accepted Inman's version, the jury still could have concluded that Inman did not act in self defense or defense of others when he unlocked his apartment door, grabbed a pipe and chased Wilson through a door and down two flights of stairs before striking him with the pipe.

## CONCLUSION

[¶ 27] The district court did not abuse its discretion in allowing Detective Elger's Rule 701 opinion testimony, and it properly denied Inman's motions for judgment of acquittal. Affirmed.